IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | Judge Jorge Solis |
| | § | |
| v. | § | Crim. No. 3:04-CR-0240 -P |
| | § | |
| ABDULRAHMAN ODEH | § | Civil Action No. 13-4299-P |
| MUFID ABDULQADER | § | Civil Action No. 13-4300-P |
| GHASSAN ELASHI | § | Civil Action No. 13-4301-P |
| MOHAMMAD EL-MEZAIN | § | Civil Action No. 13-4302-P |
| SHUKRI ABU BAKER | § | Civil Action No. 13-4303-P |
| | § | |

**UNITED STATES' OPPOSITION TO ABDULRAHMAN ODEH'S
PETITION FOR RELIEF UNDER 28 U.S.C. § 2255**

SARAH R. SALDAÑA
United States Attorney
Northern District of Texas

ELIZABETH J. SHAPIRO
JOSEPH F. PALMER
United States Department of Justice
P.O. Box 883
Washington, D.C.  20044
Tel: (202) 514-5302
Email: elizabeth.shapiro@usdoj.gov

Attorneys for the United States

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................................1

      A.     Procedural Background.................................................................1

      B.     Factual Background ......................................................................3

           1.     The Rise of Hamas and the HLF......................................3

           2.     The Philadelphia Conference .........................................5

           3.     The Indictment Committees...........................................7

      C.     Trial Counsel..............................................................................12

STANDARDS OF REVIEW .................................................................................13

      A.     Standards for Relief under § 2255 .............................................13

      B.     Standards for Claims of Ineffective Assistance of Counsel.................................14

ARGUMENT .........................................................................................................17

I.     TRIAL COUNSEL EFFECTIVELY REPRESENTED PETITIONERS
     AT TRIAL .................................................................................................17

      A.     Alleged Failure to Challenge the Government's Experts with
            Respect to Their Knowledge of Zakat Committees.................17

      B.     Alleged Failure to Call Witnesses from the Indictment Committees ...................19

      C.     Decision Not to Call Nathan Brown at the Second Trial.......................24

      D.     Alleged Failure to Challenge the Blocking Order .................25

           1.     Background ...............................................................26

           2.     Trial Counsel Reasonably Focused Their Efforts on the
                Documents in the Case................................................27

      E.     Alleged Failure to Raise a Selective Prosecution Defense .....................29

| | 1. | Legal Standard | 29 |
| | 2. | Trial Counsel Reasonably Chose Not To Pursue a Selective Prosecution Defense | 30 |
| F. | | Alleged Failure to Seek Order Compelling Disclosure of Exculpatory Evidence | 34 |
| G. | | Alleged Failure to Raise an Entrapment Defense | 37 |
| | 1. | The Government Did Not Induce Petitioner's Crimes | 38 |
| | 2. | Petitioners were Predisposed to Provide Material Support to Hamas | 40 |
| | 3. | There Were Strategic Reasons For Not Raising Entrapment | 41 |
| H. | | Alleged Failure to Pursue a Mistake of Law Defense | 43 |
| I. | | Alleged Failure to Argue Vagueness | 44 |

II. APPELLATE COUNSEL EFFECTIVELY REPRESENTED PETITIONERS ON APPEAL .......... 45

| A. | Sufficiency of Evidence | 47 |
| B. | Vagueness | 50 |
| C. | Writ of Certiorari | 52 |

III. THE FIFTH CIRCUIT DOES NOT RECOGNIZE AN "ACTUAL INNOCENCE" DEFENSE, AND IN ANY EVENT THE EVIDENCE AT TRIAL ESTABLISHED PETITIONERS' GULIT BEYOND A REASONABLE DOUBT .......... 52

IV. PETITIONERS' ALLEGATIONS OF BRADY VIOLATIONS ARE PROCEDURALLY BARRED AND IN ANY EVENT MERITLESS .......... 54

V. PETITIONERS' ARGUMENT THAT THE FIFTH CIRCUIT APPLIED AN INCORRECT HARMLESS ERROR ANALYSIS IS PROCEDURALLY BARRED AND IN ANY EVENT MERITLESS .......... 55

VI. PETITIONERS ARE PROCEDURALLY BARRED FROM RAISING SELECTIVE PROSECUTION, WHICH IN ANY EVENT HAS NO MERIT .......... 57

VII.    ODEH PRESENTS NO EVIDENCE THAT HIS COUNSEL GAVE HIM
        INCORRECT ADVICE REGARDING A POTENTIAL PLEA PRIOR TO
        THE SECOND TRIAL ......................................................................................57

VIII.   TRIAL COUNSEL EFFECTIVELY REPRESENTED ODEH WHEN HE
        PARTICIPATED IN CROSS-EXAMINING WITNESSES.............................................60

IX.     APPELLATE COUNSEL EFFECTIVELY REPRESENTED ODEH ON
        APPEAL WITH REGARD TO HIS SENTENCE AND THE SUFFICIENCY
        OF THE EVIDENCE TO SUPPORT CONSPIRACY ......................................................61

        A.      It Was Reasonable Not to Appeal Odeh's Sentence Under *Booker* ....................61

        B.      Appellate Counsel Reasonably Elected Not to Argue Sufficiency
                Of the Evidence.......................................................................................62

X.      AN EVIDENTIARY HEARING IS UNNECESSARY ...................................................66

CONCLUSION.................................................................................................67

# TABLE OF AUTHORITIES

**CASES**                                                            **PAGE(S)**

*Al-Haramain Islamic Found. v. United States Dep't of the Treasury*,
    660 F.3d 1019 (9th Cir. 2011) .......................................................................26, 28

*Alexander v. McCotter*,
    775 F.2d 595 (5th Cir. 1985) ....................................................................................20

*Atkins v. Singletary*,
    965 F.2d 952 (11th Cir.1992) ....................................................................................16

*Bryan v. United States*,
    524 U.S. 184 (1998)....................................................................................................42

*Buehl v. Vaughn*,
    166 F.3d 163 (3d Cir. 1999)......................................................................................45

*Caro v. United States*,
    2010 WL 2219717 (S.D. Fla. 2010) ........................................................................30

*Clark v. Johnson*,
    227 F.3d 273 (5th Cir. 2000) ....................................................................................50

*Cuyler v. Sullivan*,
    446 U.S. 335 (1980)....................................................................................................14

*Davis v. United States*,
    131 S. Ct. 2419 (2011)...............................................................................................28

*Day v. Quarterman*,
    566 F.3d 527 (5th Cir. 2009) ...............................................................................20, 24

*Dorsey v. Stephens*,
    702 F.3d 309 (5th Cir. 2013) ....................................................................................45

*Garrett v. United States*,
    78 F.3d 1296 (8th Cir. 1996) ....................................................................................48

*Gregory v. Thaler*,
    601 F.3d 347 (5th Cir. 2010) ....................................................................................20

*Harrington v. Richter*,
    131 S. Ct. 770 (2011)...............................................................................21, 22, 23, 24

*Harris v. Dugger,*
    874 F.2d 756 (11th Cir. 1989) .........................................................................16

*Harrison v. Quarterman,*
    496 F.3d 419 (5th Cir. 2007) ..........................................................................20

*Holder v. Humanitarian Law Project,*
    130 S. Ct. 2705 (2010)......................................................................11, 49, 50

*Holy Land Foundation for Relief and Development v. Ashcroft,*
    219 F. Supp. 2d 57 (D.D.C. 2002) ..................................................................27

*Islamic American Relief Agency v. Unidentified FBI Agents,*
    394 F. Supp. 2d 34 (D.D.C. 2005) ..................................................................27

*Jackson v. Virginia,*
    443 U.S. 307 (1979)...................................................................................46, 47

*Johnson v. Louisiana,*
    369 F.3d 826 (5th Cir. 2004) ..........................................................................61

*Jones v. Barnes,*
    463 U.S. 745 (1983).........................................................................................45

*Lafler v. Cooper,*
    --- U.S. -- 132 S.Ct. 1376 (2012) ...................................................................56

*Lockhart v. Fretwell,*
    506 U.S. 364 (1993).........................................................................................15

*Massaro v. United States,*
    538 U.S. 500 (2003).........................................................................................14

*Mathews v. United States,*
    485 U.S. 58 (1988).............................................................................37, 40, 41

*Miller v. Johnson,*
    200 F.3d 274 (5th Cir. 2000) ..........................................................................15

*Murray v. Carrier,*
    477 U.S. 478 (1986).........................................................................................14

*Murray v. United States,*
    487 U.S. 533 (1988).........................................................................................28

*Padilla v. Kentucky*,
    559 U.S. 356 (2010)........................................................................................................16

*Premo v. Moore*,
    131 S. Ct. 733 (2011)......................................................................................................14

*Rector v. Johnson*,
    120 F.3d 551 (5th Cir. 1997) ........................................................................................23

*Reed v. Stephens*,
    --- F.3d -- 2014 WL 103648 (5th Cir. 2014).................................................................56

*Ross v. Moffitt*,
    417 U.S. 600 (1974)........................................................................................................50

*Schlup v. Delo*,
    513 U.S. 298 (1995)........................................................................................................52

*Smith v. Murray*,
    477 U.S. 527 (1986)............................................................................................14, 45, 48

*Smith v. Robbins*,
    528 U.S. 259 (2000)........................................................................................................45

*Spaziano v. Singletary*,
    36 F.3d 1028 (11th Cir. 1994) ......................................................................................27

*Stano v. Dugger*,
    921 F.2d 1125 (11th Cir. 1991) ....................................................................................58

*Strickland v. Washington*,
    466 U.S. 668 (1984)................................................................................................ passim

*In re Swearingen*,
    556 F.3d 344 (5th Cir. 2009) ........................................................................................51

*Tarver v. Hopper*,
    169 F.3d 710 (11th Cir.1999) .......................................................................................16

*U.S. v. Marrero*,
    904 F.2d 251 (5th Cir. 1990) ........................................................................................35

*United States v. Armendariz-Mata*,
    949 F.2d 151 (5th Cir. 1991) ........................................................................................41

*United States v. Armstrong*,
    517 U.S. 456 (1996)................................................................................29, 33

*United States v. Banol-Ramos and Alexis Freddy Mosquera-Renteria*,
    516 Fed. Appx. 43, 2013 WL 1197722 (2d Cir. Mar. 26, 2013) .....................30

*United States v. Bartholomew*,
    974 F.2d 39 (5th Cir. 1992) ......................................................................15, 64

*United States v. Burkley*,
    591 F.2d 903 (D.C. Cir. 1978) .........................................................................40

*United States v. Blanco Puerta*,
    249 Fed. Appx. 359, 2007 WL 6774451 (5th Cir. 2007)..................................31

*United States v. Bondurant*,
    689 F.2d 1246 (5th Cir. 1982) .........................................................................14

*United States v. Bout*,
    731 F.3d 233 (2d Cir. 2013)..............................................................................30

*United States v. Brodnax*,
    601 F.3d 336 (5th Cir. 2010) ...........................................................................46

*United States v. Capua*,
    656 F.2d 1033 (5th Cir. 1981) .........................................................................13

*United States v. Cockrell*,
    720 F.2d 1423 (5th Cir. 1983) .........................................................................20

*United States v. El-Mezain, et al.*,
    664 F.3d 467 (5th Cir. 2011) ................................................................. <u>passim</u>

*United States v. Elashyi*,
    554 F.3d 480 (5th Cir. 2008) ...........................................................................42

*United States v. Fanny DeAmaris and Carlos Romero-Panchano*,
    406 F. Supp. 2d 748 (S.D. Tex. 2005) .............................................................31

*United States v. Farhane*,
    634 F.3d 127 (2d Cir. 2011).............................................................................50

*United States v. Frady*,
    456 U.S. 152 (1982)....................................................................................13, 14

*United States v. Glover,*
    153 F.3d 749 (D.C. Cir. 1998) ........................................................................37

*United States v. Gutierrez,*
    343 F.3d 415 (5th Cir. 2003) .................................................................37, 38

*United States v. Hall,*
    455 F.3d 508 (5th Cir. 2006) ........................................................................29

*United States v. Hastings,*
    126 F.3d 310 (4th Cir. 1997) ........................................................................29

*United States v. Hayes,*
    342 F.3d 385 (5th Cir. 2003) ........................................................................46

*United States v. Lindh,*
    212 F. Supp. 2d 541 (E.D. Va. 2002) ..........................................................29

*United States v. McCollom,*
    664 F.2d 56 (5th Cir. 1981) .....................................................................19, 44

*United States v. Mora-Pestana,*
    496 Fed. Appx. 98, 2012 WL 3711341 (2d Cir. 2012)...................................30

*United States v. Mulderig,*
    120 F.3d 534 (5th Cir. 1997) ........................................................................35

*United States v. Naidu,*
    480 Fed. Appx. 180, 2011 WL 3705390 (4th Cir. 2011)..............................30

*United States v. Nevile,*
    82 F.3d 1101 (D.C. Cir. 1996) ......................................................................41

*United States v. Nyhuis,*
    211 F.3d 1340 (11th Cir. 2000) ....................................................................54

*United States v. Ogbemudia,*
    364 Fed.Appx. 72 (5th Cir. 2010)..................................................................59

*United States v. Ogle,*
    328 F.3d 182 (5th Cir. 2003) ........................................................................37

*United States v. Pierce,*
    959 F.2d 1297 (5th Cir. 1992) ......................................................................19

*United States v. Placente,*
    81 F.3d 555 (5th Cir. 1996) .........................................................................13

*United States v. Plewniak,*
    947 F.2d 1284 (5th Cir.1991) ......................................................................64

*United States v. Pratheepan Thavaraja, Murugesu Vinayagamoorthy, Vijayshanthar*
    *Patpanathan, Gaspar Rah Maria Paullan, Namiasivaya Viswanathan,*
    *Nachimuthu Socrates and Karunakaran Kandasamy,*
    2009 WL 692113 (2d Cir. Mar. 18, 2009) .................................................30

*United States v. Ramos-Cardenas,*
    524 F.3d 600 (5th Cir. 2008) .......................................................................46

*United States v. Reed,*
    719 F.3d 369 (5th Cir. 2013) .......................................................................56

*United States v. Reyeros,*
    537 F.3d 270 (3d Cir. 2008)..........................................................................34

*United States v. Rivas-Lopez,*
    678 F.3d 353 (5th Cir. 2012) .......................................................................16

*United States v. Rochester,*
    898 F.2d 971 (5th Cir.1990) .........................................................................42

*United States v. Rubio,*
    677 F.3d 1257 (D.C. Cir. 2012).....................................................................30

*United States v. Russell,*
    411 U.S. 423 (1973).......................................................................................37

*United States v. Schultz,*
    333 F.3d 393 (2d Cir. 2003)...........................................................................43

*United States v. Shaid,*
    937 F.2d 228 (5th Cir. 1991) ...........................................................14, 53, 55

*United States v. Spires,*
    79 F.3d 464 (5th Cir. 1996) .........................................................................38

*United States v. Stewart,*
    207 F.3d 750 (5th Cir. 2000) .......................................................................16

*United States v. Torres,*
    163 F.3d 909 (5th Cir. 1999) ...................................................................................14, 53

*United States v. Vergara,*
    612 F. Supp. 2d 36 (D.D.C. 2009) .....................................................................................30

*United States v. Viglakis,*
    2013 WL 4477023 (S.D.N.Y. 2013)...................................................................................30

*United States v. Webster*,
    162 F.3d 308 (5th Cir. 1998) ............................................................................29, 31, 33

*United States v. Williams,*
    610 F.3d 271 (5th Cir. 2010) ............................................................................................46

*Wayte v. United States*,
    470 U.S. 598 (1985).............................................................................................................29

*Williams v. Collins,*
    16 F.3d 626 (5th Cir. 1994) ..............................................................................................46

## STATUTES

18 U.S.C. § 2339B ....................................................................................... passim
28 U.S.C. § 2255......................................................................................................1, 2
50 U.S.C. §§ 1701-1706 .......................................................................................43, 49
Fed. R. App. P. 28(j)...............................................................................................26

## FEDERAL RULE OF CIVIL PROCEDURE

Fed. R. Civ. P. 28(b) ...............................................................................................21

## FEDERAL RULE OF EVIDENCE

Rule 403 ....................................................................................................................41

## MISCELLANEOUS

Levitt, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad* ................................................11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | Judge Jorge Solis |
| | § | |
| v. | § | Crim. No. 3:04-CR-0240 -P |
| | § | |
| ABDULRAHMAN ODEH | § | Civil Action No. 13-4299-P |
| MUFID ABDULQADER | § | Civil Action No. 13-4300-P |
| GHASSAN ELASHI | § | Civil Action No. 13-4301-P |
| MOHAMMAD EL-MEZAIN | § | Civil Action No. 13-4302-P |
| SHUKRI ABU BAKER | § | Civil Action No. 13-4303-P |
| | § | |

## UNITED STATES' OPPOSITION TO ABDULRAHMAN ODEH'S PETITION FOR RELIEF UNDER 28 U.S.C. § 2255

## INTRODUCTION

The government opposes Abdulrahman Odeh's petition for relief under 28 U.S.C. § 2255 because his claims are procedurally barred or otherwise lack merit. Odeh raises numerous claims in common with four of his codefendants (Mufid Abdulqader, Ghassan Elashi, Mohammad El-Mezain, and Shukri Abu Baker, collectively "petitioners"), as well as several claims specific to Odeh only. To establish entitlement to relief, petitioners must, at bottom, establish that their trial was so fundamentally unfair as to make the result unreliable. Petitioners cannot make that showing here. The Fifth Circuit expressly found that petitioners received a fair trial, and that the evidence of guilt was formidable. Accordingly, petitioners' motion should be denied.

### A.    Procedural Background

On July 26, 2004, a federal grand jury returned a 42-count indictment against the petitioners and the Holy Land Foundation for Relief and Development ("HLF"). The indictment charged the defendants with conspiracy to provide material support to a designated foreign terrorist organization; twelve counts of providing material support to a

foreign terrorist organization; conspiracy to provide funds, goods and services to a

Specially Designated Terrorist; twelve counts of providing funds, goods and services to a

Specially Designated Terrorist; conspiracy to commit money laundering; twelve counts

of money laundering; one count of conspiracy to impede the Internal Revenue Service

and to file false tax returns; and three counts of filing false tax returns of an organization

exempt from income tax.  (ecf # 1, # 233) (Superseding Indictment).  *See generally*

*United States v. El-Mezain, et al.*, 664 F.3d 467, 485-490 (5th Cir. 2011) (setting forth

detailed procedural and factual history of the case).[1]

The case went to trial on July 24, 2007, before the Honorable A. Joe Fish and a

jury.  The jury acquitted El-Mezain on all counts except Count 1 (conspiracy to provide

material support to a foreign terrorist organization) and hung on all counts as to all other

defendants.  R. 3/5440.  The case was then reassigned to this Court.  On October 29,

2008, the government dismissed the charges against Odeh and Abdulqader other than the

three conspiracy counts (Counts 1, 11, and 22) (ecf # 1161).  The case went to trial in

September 2008.  Following six weeks of trial, the jury convicted all petitioners on all the

remaining charges.  (ecf # 1250).

On May 27, 2009, the district court sentenced Baker and Elashi to 65 years'

imprisonment, to be followed by three years of supervised release.  The court sentenced

Abdulqader to 20 years' imprisonment, to be followed by three years of supervised

---

[1] Citations to record documents filed as entries on the docket sheet are shown as "ecf # __" where
the blank is the docket number.  Citations to trial transcripts are shown as "Tr." followed by the
volume number, date, and page number.  Citations to the electronic record on appeal, which
consists of 48 pdf files (one is the docket sheet, 46 are named "holyland 1" through "holyland
46," and the last is named "Holyland Supp") are shown as "R__/___" where the first blank is the
number in the filename and the second is the "USCA5" page number in the lower right corner
(*e.g.*, R. 7/9678 references page 9678 of the file named "holyland 7").

*UNITED STATES' OPPOSITION TO ABDULRAHMAN ODEH'S PETITION FOR RELIEF UNDER*
*28 U.S.C. § 2255 - P a g e  | 2*

release.  The court sentenced Odeh and El-Mezain to 15 years' imprisonment, to be followed by three years of supervised release.  Each of the petitioners appealed.

The United States Court of Appeals for the Fifth Circuit unanimously affirmed the convictions and sentences of the individual appellants.  *El-Mezain*, 664 F.3d at 484. Petitions for rehearing en banc were denied February 17, 2012, and the Supreme Court denied certiorari on October 29, 2012.  Petitioners timely filed these petitions under 28 U.S.C. § 2255 on October 25, 2013.  Petitioners have not filed any prior post-conviction motions under the rules governing habeas proceedings.

### B.    Factual Background

#### 1.  The Rise of Hamas and the HLF

The evidence at trial established that Hamas ("the Islamic Resistance Movement") is an international terrorist organization with the stated objective of destroying the State of Israel and replacing it with an Islamic state.   Hamas is organized into distinct wings, or bureaus, that perform different functions, but operate as a seamless whole.  It includes a military wing, responsible for carrying out suicide bombings and other terrorist attacks; a social wing, which operates much like a social welfare agency; and a political wing, which sits above the military and social wings and is responsible for setting policies and guidelines regarding Hamas' activities.  R. 4/3676-77.  On January 24, 1995, pursuant to Executive Order 12947, the Department of Treasury designated Hamas as a Specially Designated Terrorist ("SDT"). This designation made it illegal for any United States person or entity to engage in any unlicensed transactions with Hamas or dealings involving the property or interests of Hamas.  Hamas' designation as a  SDT has remained in place since January 24, 1995. On October 8, 1997, the Secretary of State

designated Hamas as a Foreign Terrorist Organization ("FTO").  As a result, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to Hamas.

The conspiracy involving these petitioners began years before the enactment of the Executive Orders and material support statutes at issue.  In late 1987, violent confrontations between the Palestinians and Israelis sharply increased, and Palestinian demonstrations evolved into widespread physical violence.  This resistance to the Israeli presence in the West Bank and Gaza became known as the First Intifada, an Arabic term translated as "uprising."  At the outbreak of the First Intifada, Sheik Ahmed Yassin, an Islamic cleric from Gaza, was the leader of the Palestinian branch of the Muslim Brotherhood, an Islamic movement that originated in Egypt in 1928.

In December 1987, Sheik Yassin founded Hamas.  In order to raise funds and otherwise support its operations, Hamas looked outside of the Palestinian areas to individuals and organizations around the world that were sympathetic to its mission.  R. 4/3839.  The International Muslim Brotherhood directed that Muslim Brotherhood chapters around the world, including in the United States, establish "Palestine Committees" in order to provide support for Hamas from abroad.  GX Elbarasse Search 5, at 14.  The purpose of the Palestine Committee was to establish and supervise organizations in the United States in order to provide "strong support for their tool and striking wing, the Islamic Resistance Movement (Hamas)."  GX Elbarasse Search 5, at 14-15.  One of those organizations was HLF, and its stated purpose was to raise funds for Hamas.  GX Elbarasse Search 5, at 14.  The Palestine Committee designated HLF as the "official organization" for raising money.  GX Elbarasse Search 7.  Palestine Committee

documents confirm that HLF was established and operated in accordance with instructions from the Muslim Brotherhood's leadership to "[c]ollect donations for the Islamic Resistance Movement." *Ibid*; GX Elbarasse Search 13.  Consistent with HLF's mission to support Hamas, abundant evidence at trial further established the petitioners' extensive ties to senior Hamas leaders.  *See, e.g.*, GX Payments Between Marzook/Defendants; GX Payments to K&A Trading;  GX Marzook/Defendants Phone Calls; GX Ashqar Wiretap 3; GX Ashqar Wiretap 4; GX Marzook Phone Book; GX Ashqar Search 1; GX Ashqar Search 3; GX Ashqar Search 11; GX HLF Search 16; R. 7/6735, 6775, 6786-87, 6792, 6795; GX Illa Filistine 2, at 9; R. 5/4709; R. 4/4786-87; GX El-Mezain Wiretap 4; *See generally El-Mezain*, 664 F.3d at 527-531 (detailing petitioners' connections to Hamas).

### 2.  The Philadelphia Conference

In October 1993, a month after the signing of the Oslo Peace Accords, members of the Palestine Committee gathered in Philadelphia to discuss how Hamas's support network in the U.S. should proceed in light of the Accords.  R. 4/4569-70.  Baker was involved in planning the meeting.  R. 4/4574; GX Ashqar Wiretap 1.  Appellants Baker, Elashi, and Abdulqader were present.  *See* GX Philly Meeting Summary.

Palestine Committee leader Omar Ahmed stated that the meeting was "called for by the Palestine Committee" to "study the situation in light of the latest developments in the Palestinian arena, its effects and impact on our work here in America."  R. 7/6081.  Another speaker at the meeting emphasized that the Committee's organizations, including HLF, "should be in complete harmony" with the overall purpose of Hamas.  R. 4/4606-07.

Baker agreed that the organizations needed to support Hamas's strategic goal of "derailment" of the Oslo Accords.  GX Philly Meeting 6E.  But he and others suggested that, because in the United States the authorities and public opinion increasingly recognized Hamas as a terrorist group, it was necessary to change their public message to conceal their alignment with Hamas.  GX Philly Meeting 6E, 5E.  Baker recognized that Hamas's classification as a terrorist organization under U.S. law would create a "legal obstacle" to supporting Hamas, GX Philly Meeting 6E, and accordingly the support organizations needed to practice deception.  GX Philly Meeting 7E, 12E.  Moreover, attendees at the meeting recognized that HLF had already been exposed as a Hamas charity.  R. 4/4631; GX Philly Meeting 13E, 5E.  Baker repeatedly emphasized that "war is deception," and that the committee must "deceive [the] enemy."  GX Philly Meeting 7E.  In a discussion about how to present themselves publicly to Americans, Baker said, "I cannot say to him that I'm Hamas."  GX Philly Meeting 8E.  After Baker emphasized the need for the organizations to lie and deceive to conceal their connections to Hamas, Omar Ahmed told the participants to "learn from [their] masters" in the HLF.  GX Philly Meeting 12E.

Baker's recommendation that the Committee's members and organizations use deception and tradecraft applied to the meeting itself.  Baker urged the attendees not to say the word "Hamas" explicitly, but instead to refer to "sister Samah" (Hamas spelled backwards).  R. 4/4599, 4603.[2]  Baker also provided a cover story, instructing that, "[i]n case someone inquired," the attendees should say the meeting was a joint session of HLF

---

[2] In a sworn declaration submitted in a civil lawsuit, Baker stated that the term "Samah" was nothing more than a whimsical play on words and not intended to disguise anything.  R. 4/4601. In closing argument, however, Baker's counsel conceded that in making that statement, as well as in denying any connections to Hamas, Baker had not been "forthcoming."  R. 7/9545.

and another organization, the Islamic Association of Palestine.  R. 4/4598-99.

Consistent with their marching orders from the Philadelphia conference, petitioners lied about their associations with Hamas.  For example, Abdelqader falsely stated to the FBI that he had no affiliation with HLF and knew no one there prior to 1995, though credit card records showed he had been raising funds for HLF for years prior to 1995, and a videotape showed him being introduced by Baker in 1990 at an event where he performed Hamas songs.  R. 4/4785-86.  Baker denied in a deposition that Marzook had any relationship or involvement with HLF, other than a single early contribution.  R. 4/4693-94.  Baker also filed a declaration in litigation related to the designation of HLF as an SDT in which he denied he had "any connection whatever to Hamas," because "I reject and abhor Hamas."  R. 4/4710.

### 3.  The Indictment Committees

After Hamas was designated as an SDT and an FTO in 1995 and 1997, respectively, the tone and language of the conferences, publications, and speakers supported by HLF began to change in order to limit exposure of HLF's affiliation with Hamas.  R. 7/6775-6777.  In the years following the new terrorism laws until HLF itself was designated in 2001, HLF sent much more of its money to its own offices or representatives in the Palestinian areas.  R. 7/6775.  However, HLF continued supporting the same organizations and institutions that it supported prior to the designation.  R. 7/5597-98, 6775, 6793, 6798.

The indictment charged post-designation transactions with seven West Bank social committees: The Islamic Charity Society (ICS) of Hebron, the Jenin Zakat Committee, the Nablus Zakat Committee, the Ramallah Zakat Committee, the Tulkarem

Zakat Committee, the Islamic Science and Culture Committee, and the Qalqilia Zakat

Committee (the "Indictment Committees").  R. 3/7051-64.  Financial records showed that

HLF transferred more than four million dollars to the Indictment Committees.[3]  All of

those committees were under the control of Hamas and were an integral part of the

Hamas social infrastructure.  The government at trial established that fact from numerous,

mutually corroborating sources of evidence.  *See generally El-Mezain*, 664 F.3d at 489,

531-535 (detailing evidence that Hamas controlled the Indictment Committees).

●  Reports from the Ashqar and Elbarasse documents, as well as the Philadelphia

meeting transcript, reflect the Palestine Committee's close monitoring of the growing

Hamas infiltration of and control over social committees in the West Bank and Gaza,

including several of the Indictment Committees.  The earliest document, a "work paper"

on the roles of the Muslim Brotherhood and Hamas, discussed the extent of the "Islamic

presence" in the Nablus, Jenin, and Tulkarem Committees, as well as ICS Hebron, all of

which are Indictment Committees.  R. 4/7098-7100; GX Ashqar Search 5.

A 1991 letter addressed to "brother Shukri" (petitioner Shukri Baker) showed that

Hamas had increased its control of some of the Indictment Committees.  The letter

contained a table listing a number of committees, identifying some of their leaders, and

specifying the extent to which they were "ours."  The letter informed Baker that the Jenin

Committee was "guaranteed," and that they "ha[d] gained more control" of the Ramallah

Committee, and "all of it is ours."  GX Elbarasse Search 22 at 4.  The letter further

---

[3] The evidence showed that, while much of that money was transferred prior to Hamas's
designation, HLF continued sending substantial sums to the Indictment Committees following the
designation. *See El-Mezain*, 664 F.3d at 489 ("the strongest evidence that the defendants provided
support to Hamas after Hamas was designated as a terrorist organization came through testimony
and financial documents showing that HLF provided funds to the same Hamas-controlled zakat
committees that it had supported before the designation.")

informed Baker that "[a]ll" of the ICS Hebron and Ramallah Committees were "ours;" and that all of the Qalqilia Committee was "ours and it is guaranteed." *Ibid.*

At the Philadelphia meeting, Palestine Committee member Muin Shabib presented a report on the extent to which various zakat committees and other organizations belonged to Hamas. R. 7/7051; GX Philly Meeting 13E. The Shabib report mentioned several of the Indictment Committees, including the Nablus, Jenin, Tulkarem, Qalqilia, and Ramallah zakat committees. The report indicated that Hamas control of some committees was extensive and growing, especially the Ramallah committee, which was "ours, including its management and officers." R. 7/7052-54; GX Philly Meeting 13E.

● The government introduced documents and other evidence demonstrating a web of connections linking the committees' leaders with Hamas, as well as with HLF and the individual defendants. For example, the government introduced a videotape, found in HLF's office and referred to at trial as the "tent video," that depicts an interview with Hamas activists who had been deported from Israel to Lebanon. R. 7/7080; GX HLF Search 70. The Hamas symbol flashes on the screen throughout the video. R. 7/7081. The video shows several individuals introducing themselves to the camera and identifying what social committee they represent, including Fuad Abu Zeid who announces that he is from the Jenin Zakat Committee. R. 7/7083. The letter to Shukri Baker listing a table of committees and the extent to which they were "ours" stated that the Jenin Zakat Committee was "[g]uaranteed, by virtue of Mohammad Fuad Abu Zeid's position." GX Elbarasse Search 22. An expert witness from the Israeli Security Agency also testified that Abu Zeid was a senior Hamas leader and member of the Jenin Zakat

Committee.  R. 7/8049-50.  Abu Zeid was also on the HLF overseas speakers list, his name and telephone number were found in Marzook's address book, he was identified as a prominent Hamas activist in a book about Hamas found in Odeh's office, and he was mentioned in a conference speech by Hamas leader Khalid Mishal.  R. 7/5662, 7106-7108.

As another example, Abdel Khaleq Natshe was one of the senior members of Hamas in the West Bank and was a leader of one of the Indictment Committees, ICS Hebron.  R. 7/8178.  The government played a videotape, seized from the ICS Hebron by the Israeli military, depicting a youth summer camp ceremony in 2001 in which Natshe appears and a woman introduces him as the head of Hamas in Hebron.  R. 7/8225-26; GX ICS Hebron 12.  The letter to Shukri states that all of ICS Hebron is "ours" because it "has Abdel Khalik Natshe and Hashem al Natshe, our people."  R. 7/7169; GX Elbarasse Search 22.  Both Abdel Khalik Natshe and Hashem al Natshe appear in Marzook's phone book.  R. 7/8179-80.  A letter from HLF in 1994 addressed to ICS Hebron related to a $43,000 contribution for "martyrs' families" notes "[p]lease notify brother Abdel Khaliq al-Natsheh of the arrival of the amount and deliver it to their committee."  R. 7/8252; GX InfoCom Search 13, at 70.

Leaders and members of the other Indictment Committees had similar connections with Hamas and the defendants, as documented in the Elbarasse, Ashqar, and Philadelphia meeting reports on social committees, the HLF overseas speakers list and other HLF records and correspondence, Marzook's address book, the "tent video" of Hamas deportees and other videos, bank accounts and other documents seized from the committees, and other exhibits.  The government introduced summary exhibits for each

Indictment Committee that listed the committee's leaders and/or members and noted their

Hamas links, with reference to the underlying admitted exhibits.  *See* GX Jenin Zakat

Summary, GX Nablus Zakat Summary, GX ICS Hebron Summary, GX Tulkarem Zakat

Summary, GX Qalqilia Zakat Summary, GX Ramallah Zakat Summary, GX Islamic

S&C Summary.

● The government called an expert witness on Hamas, Dr. Matthew Levitt,[4] who

testified that leaders of the Ramallah and Jenin Zakat Committees had been implicated in

supporting terrorist attacks, purchasing weapons, and other activities in support of

Hamas's military wing.  R. 4/3836.

● In response to a major terrorist attack in 2002, the Israeli Defense Forces (IDF)

launched a military operation called Operation Defensive Shield, during which the IDF

seized documents and other items from various social committees in the West Bank,

including several of the Indictment Committees.  R. 4/6872.  The IDF found  Hamas

documents and Hamas propaganda inside the committees, including Hamas political

literature and internal Hamas documents, posters of Hamas suicide bombers, videotapes

showing children praising or acting out Hamas attacks, postcards of Hamas martyrs, and

keychains with pictures of Hamas leaders.  *E.g,* GX ICS Hebron 1, 2, 6, 7, 11, 12; GX

Jenin Zakat 1, 6; GX Nablus Zakat 1, 2, 3.

● The government called an expert witness from the Israeli Security Agency,

---

[4] The Supreme Court quoted Levitt's book, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad*, in rejecting a First Amendment challenge to the material support statute. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2725 (2010) (quoting Levitt's conclusion that Hamas "[m]udd[ies] the waters between its political activism, good works, and terrorist attacks" by using "its overt political and charitable organizations as a financial and logistical support network for its terrorist operations").  The Court, relying on Levitt and other sources, including findings of Congress, recognized that terrorist groups such as Hamas "systematically conceal their activities behind charitable, social, and political fronts." *Id.*

who testified under the pseudonym "Avi."  R. 7/7848-49.  Avi had spent years studying

and documenting Hamas's control of social committees in the West Bank and Gaza.  R.

7/7851-57.  Avi explained the history of how Hamas came to control the Indictment

Committees, as well as the Israeli government's treatment of the committees throughout

that time.  *E.g.*, R. 7/7904-07.  Avi also identified the Hamas members, including

members of the military wing, and other Hamas connections among the leadership of the

committees.  *E.g.*, R. 7/8049-55.  Avi described the documents and other evidence the

IDF had seized from the committees  and explained how that evidence showed Hamas

control of the committees.  *E.g.*, R. 7/8091-94.  Based on all of that evidence and his

years of investigation and experience, Avi testified that Hamas controlled each of the

Indictment Committees and that they formed a part of Hamas's social infrastructure in

the West Bank.  *E.g.*, R. 7/8114, 8125.

### C.  Trial Counsel

The crux of petitioners' motion is that their counsel, at trial and on appeal,

rendered ineffective assistance.  Unlike the majority of such petitions, the petitioners here

were represented by multiple counsel of their choosing – nine in all – including some of

the most accomplished criminal defense lawyers in the country.  Their experience spans

decades, and their expertise specifically includes terrorism and national security cases.

*See* biographies for Nancy Hollander, http://www.fbdlaw.com/nh.html; Joshua Dratel,

http://www.nycriminallawfirm.com; John Cline, http://www.johndclinelaw.com;  Linda

Moreno, http://lindamoreno.wordpress.com; Greg Westfall,

http://www.gregwestfall.com; and Marlo Cadeddu, http://www.marlocadeddu.com.

These lawyers and their partners worked together for numerous years to defend

*UNITED STATES' OPPOSITION TO ABDULRAHMAN ODEH'S PETITION FOR RELIEF UNDER*
*28 U.S.C. § 2255 - P a g e  | 12*

their clients.  They entered into a joint defense agreement, coordinated efforts, divided up briefing and witness examinations, and throughout the case presented a unified defense, "that HLF was established and operated as a legitimate charity to help the desperate Palestinian people."  (ecf # 1447 at 16).  This Court recognized defense counsel as "accomplished," *id.* at 15, and "competent."  (ecf # 1138 at 5).  The Fifth Circuit, at the close of oral argument, complimented the briefing by both sides of the case as "world class."[5]  In the first trial of this case, these nine attorneys achieved a mistrial.  Petitioners' motion now contends that these attorneys made strategic choices in the second trial and on appeal so deficient and contrary to professional norms as to violate their clients' constitutional rights.

## STANDARDS OF REVIEW

### A.  Standards for Relief under § 2255

"Section 2255 does not offer recourse to all who suffer trial errors."  *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981).  And it "may not do service for an appeal."  *United States v. Frady*, 456 U.S. 152, 165 (1982).  After a defendant has been convicted and exhausted or waived all appeals, the Court is "entitled to presume" that the defendant "stands fairly and finally convicted."  *Id.* at 164.

Section 2255 relief is "reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and, would, if condoned, result in a complete miscarriage of justice."  *Capua*, 656 F.2d at 1037.  Relief may be granted on one of four grounds: "(1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without

---

[5] The oral argument recording is available at
http://www.ca5.uscourts.gov/OraLArgumentRecordings.aspx.

*UNITED STATES' OPPOSITION TO ABDULRAHMAN ODEH'S PETITION FOR RELIEF UNDER 28 U.S.C. § 2255 - P a g e  | 13*

jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is otherwise subject to collateral attack." *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) (internal quotation marks omitted).

Generally, a petitioner is procedurally barred from presenting claims of error in a § 2255 motion that could have been raised in the direct appeal but were not. *See United States v. Torres*, 163 F.3d 909, 911 (5th Cir. 1999). To avoid dismissal of defaulted claims, a petitioner must show "both 'cause' for his procedural default and 'actual prejudice' resulting from the error." *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (en banc). "This cause and actual prejudice standard presents 'a significantly higher hurdle' than the 'plain error' standard" applied on direct appeal. *Id.* (quoting *Frady*, 456 U.S. at 166). An attorney's decision not to raise an issue cannot excuse a procedural default unless that decision amounts to ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 492 (1986) ("Attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default."). Only after satisfying the heavy burden to show cause and prejudice may a petitioner obtain a ruling on the merits of a defaulted claim presented in his motion. *United States v. Bondurant*, 689 F.2d 1246, 1250 (5th Cir. 1982).

### B.  Standards for Claims of Ineffective Assistance of Counsel

A petitioner can raise an ineffectiveness claim for the first time in a § 2255 petition without having to overcome the procedural bar. *Massaro v. United States*, 538 U.S. 500, 504 (2003). The Sixth Amendment guarantees a criminal defendant reasonably effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344–45 (1980). It is a prisoner's burden to prove his counsel rendered ineffective assistance; it is not the

government's burden to show otherwise.  *See Premo v. Moore*, 131 S. Ct. 733, 739–40 (2011).

To obtain relief because of ineffective assistance of counsel, a petitioner must satisfy a two-prong test.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  He must first prove his lawyer's performance was deficient.  *Id.*  Simply making "conclusory allegations" is insufficient.  *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000).  The petitioner must identify specific acts or omissions that were not the result of reasonable professional judgment.  *Strickland*, 466 U.S. at 690.  This "scrutiny . . . must be highly deferential" and "requires that every effort be made to eliminate the distorting effects of hindsight[.]"  *Id.* at 689.  This is because it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission . . . was unreasonable."  *Id.*  The Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case" and "evaluate [that] conduct from counsel's perspective at the time."  *Id.* at 689–90.  To that end, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* at 689 (internal quotation marks and citations omitted).

Second, a petitioner must prove that his attorney's deficient performance prejudiced his case.  *Id.*  This requires showing "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  There is no prejudice if the deficient performance

did not "deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* Put another way, a petitioner must prove that but for counsel's errors, "there is a reasonable probability that" the result of the proceeding would have been different. *Strickland*, 466 U.S. at 693–94; *United States v. Bartholomew*, 974 F.2d 39, 41–42 (5th Cir. 1992).

Finally, the court evaluates an ineffective assistance claim based on an objective standard of reasonableness. "To establish an ineffective assistance claim, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's poor performance the result of the proceeding would have been different." *United States v. Rivas–Lopez,* 678 F.3d 353, 356–57 (5th Cir. 2012). Because the standard is an objective one, the fact that trial counsel, in an affidavit or at a post-conviction evidentiary hearing, admits that his performance was deficient matters little. *See Tarver v. Hopper,* 169 F.3d 710, 716 (11th Cir.1999) (noting that "admissions of deficient performance are not significant"); *see also Atkins v. Singletary,* 965 F.2d 952, 960 (11th Cir.1992) ("[I]neffectiveness is a question which we must decide, [so] admissions of deficient performance by attorneys are not decisive.") (quoting *Harris v. Dugger,* 874 F.2d 756, 761 n.4 (11th Cir. 1989).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). The claim fails if the petitioner does not satisfy either the deficient-performance prong or the prejudice prong, and a court need not address both components if there is an insufficient showing on one. *United States v. Stewart*, 207 F.3d 750, 751 (5th Cir. 2000).

## ARGUMENT

### I.   TRIAL COUNSEL EFFECTIVELY REPRESENTED PETITIONERS AT TRIAL

At the outset, petitioners face an extraordinarily high bar to satisfy the demanding standard set forth in *Strickland*. Petitioners cannot meet that standard here. Some of these lawyers have represented the HLF and its officers continuously since 2001. They presented a vigorous defense both pre-trial and at two separate trials, and pursued a substantial appeal, petition for rehearing en banc, and petition for certiorari. It strains credulity to assert now that these same attorneys performed in so deficient a manner as to violate the due process rights of their clients. That is particularly so in light of the Fifth Circuit's thorough evaluation of the evidence and legal arguments, and its fundamental conclusion that the defendants received a fair trial. *El-Mezain*, 664 F.3d at 485.

#### A.   Alleged Failure to Challenge the Government's Experts with Respect to Their  Knowledge of Zakat Committees.

Petitioners allege that trial counsel failed to mount a "specific challenge to the witnesses of knowledge as to whether Hamas controls the Zakat committees …." Petitioners' Joint Memorandum In Support of Motion to Vacate ("Pet. Mem.") at 7. But, as petitioners concede, trial counsel mounted a *Daubert* challenge to both the government's experts, Matthew Levitt and Avi.  (ecf #582). During the *Daubert* hearing, and again on cross-examination, defense counsel specifically attacked the factual basis for the government experts' testimony, including their knowledge about Hamas' control over the committees. For example, Ms. Cadeddu challenged Dr. Levitt about the basis of his knowledge, the sufficiency of his primary sources, and his vetting process. *See generally*, Transcript of July 23, 2007 (*Daubert* hearing).  In addition, all defendants

moved to exclude Dr. Levitt's testimony in a Joint Motion to Exclude the Government's

Proposed Experts.  Specifically, defendants argued that "Levitt's conclusions about the

persons and entities named in the Superseding Indictment are based entirely on secondary

sources, when they have any basis at all."  Indeed, defendants spent over 15 pages of

their motion contesting the validity of Dr. Levitt's factual predicate for his proposed

testimony.  *See* Defendants' Joint Motion to Exclude the Government's Proposed Experts

or, in the Alternative, for a Hearing Under *Daubert*  (March 14, 2007) (ecf #582).

Defendants renewed that motion to this Court on May 30, 2008.  *See* Defendants' Notice

and Renewal of Previous Motions (ecf #1036).  And, during trial and after the

government proffered Dr. Levitt as an expert, Mr. Cline renewed the defendants' prior

objection.  *See* R. 4/3665.

Similarly, with respect to Avi, the court conducted a *Daubert* hearing on August

13, 2007.  During that hearing, Avi was questioned at length about the factual bases

underlying his knowledge of the committees listed in the Indictment, including his

methodology for determining who the members of the committee were during the

relevant time period, whether a person was affiliated with Hamas, and his overall

conclusions about the affiliation of each committee.  *See generally*, transcript of *Daubert*

hearing, Aug. 13, 2007, at 16-56.  Defense counsel at that hearing specifically objected to

Avi being qualified as an expert.  *Id*. at16.  Defense counsel also objected during trial, at

the time Avi was proffered as an expert before the jury.  *See* R. 7/7858.

Finally, during closing arguments, defense counsel argued extensively that both

Dr. Levitt and Avi lacked personal knowledge about the zakat committees.  *See*

Transcript, Nov. 11, 2008, R. 23/6342-43 ("And remember Avi and Matthew Levitt

didn't even bother to talk to a single person who received such aid. Don't you think that would be important and compelling?"); R. 23/6345 ("Avi never read a book on zakat committees and Levitt never wrote a book on zakat committees. Avi researched on the weekends and after hours and Matthew Levitt told you that he didn't study zakat committees. Neither Avi nor Levitt set foot in a zakat committee"); R. 23/6345 ("Neither one of them polled Palestinians. Never spoke to the community. Well, Matthew Levitt says he spoke to prisoners. Okay? Neither one of them speak Arabic"); R. 23/6346 ("He [Dr. Levitt] didn't tell you one thing about the so-called control exercised by Hamas. He hasn't studied the zakat committees.").

In short, petitioners' claim of ineffective assistance cannot succeed where, in contrast to petitioners' allegations, trial counsel raised (on multiple occasions) the very arguments that petitioners now claim they were negligent in not making. *United States v. McCollom*, 664 F.2d 56, 59 (5th Cir. 1981) (holding that an issue that has been raised and ruled upon adversely to a defendant may not be re-litigated in the context of a Section 2255 motion). Having in fact made these arguments, there can be no argument the defense attorneys' representation fell below reasonable standards, or that the petitioners were prejudiced. *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992).

## B. Alleged Failure to Call Witnesses from the Indictment Committees

Petitioners allege that defense counsel were ineffective because they should have pursued, and called as witnesses, a number of individuals from the West Bank who allegedly were members of the Indictment Committees during the relevant time period. *See* Pet. Mem. at 8-9 and Exh. 1. Petitioners' argument lacks merit. The selection of which witnesses to call to address the Indictment Committees' affiliation with Hamas

was a strategy call that is not susceptible to a claim of ineffective assistance of counsel.

Defense counsel's choices were reasonable, given the available resources and the danger

that West Bank witnesses would be impeached on cross-examination and portrayed as

self-serving.  Even more fundamentally, however, none of the affidavits that petitioners

present here indicates that the affiants were willing and able to come to Dallas to testify

at trial.  For that reason alone, petitioners cannot show prejudice, and their argument

therefore fails.

Ineffective assistance of counsel claims premised on the failure to call witnesses

are "not favored because the presentation of witness testimony is essentially strategy and

thus within the trial counsel's domain, and . . .  speculations as to what these witnesses

would have testified is too uncertain."  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th

Cir. 1985); *Gregory v. Thaler*, 601 F.3d 347, 352-53 (5th Cir. 2010); *Day v. Quarterman*,

566 F.3d 527, 538 (5th Cir. 2009).  In addition to the strong presumption that the decision

not to call a witness is one of strategy, the habeas petitioner must also demonstrate

prejudice.  *Alexander*, 775 F.2d at 602, citing *United States v. Cockrell*, 720 F.2d 1423,

1427 (5th Cir. 1983).  In order to demonstrate prejudice, the habeas petitioner must show

that the witness was available and would have testified at trial.  *Alexander*, 775 F.2d at

603; *Day*, 566 F.3d at 538; *Gregory*, 601 F.3d at 352, *Harrison v. Quarterman*, 496 F.3d

419, 428 (5th Cir. 2007).

Here, petitioners have presented the affidavits of a number of individuals who

make the identical, conclusory claim:  They were members of an Indictment Committee

during the relevant time period, they were not members of Hamas, and their committee

was not affiliated with or controlled by Hamas.  Nowhere in the affidavits do the affiants

swear that they were willing, able, and available to come to Dallas to testify at trial and

subject themselves to cross-examination.  That omission alone is fatal to petitioners'

attempt to establish prejudice.  *Day*, 566 F.3d at 538 (rejecting ineffective assistance

claim based on an uncalled witness because, although prospective witness presented a

"lengthy affidavit," he did not "state that he was available to testify at trial, that he would

have done so, or that he would have testified in accord with the opinions and conclusions

he states in this affidavit.")

Indeed, given the expense and the logistical hurdles of bringing witnesses from

the West Bank, it is highly unlikely that these individuals could have come to Dallas to

testify.  *See Harrington v. Richter*, 131 S. Ct. 770, 789 (2011) (counsel entitled to balance

limited resources in accordance with effective trial tactics and strategies).  That is

especially true in this case, given the amount of money defense counsel expended from

public funds in the investigation and defense of the case.  (ecf # 1138 at 4-5) (R. 3/6305)

(detailing "considerable resources" spent during first trial, including funds for "experts,

investigators and counsel," and noting that "[t]hese are competent attorneys who certainly

were prepared to try this case the first time"). Moreover, defense counsel themselves

argued for Rule 15 depositions based in part on the very fact that the potential foreign

defense witnesses were "*unwilling* to travel to the United States to testify on behalf of the

Defendants."  *See* ecf # 327 at 7; (R. 2/941), renewed at ecf # 1036 (emphasis added); *see

also id*. ("In addition, serious logistical impediments exist for some of the witnesses to

receive permission to enter the United States, or even leave their own locales. The

absence of a foreign witness who travels to the United States to testify in an American

court will not pass unremarked when he returns to his home and may generate negative

attention."); ecf # 1036 [6]  These statements from trial counsel are consistent with the affiants' conspicuous failure to state in their affidavits that they were willing and able to travel to Dallas to testify at trial.

Even if these affiants could have come, and were willing to come, it was a reasonable choice for defense counsel to rely on other witnesses to make their arguments about the Indictment Committees.  It was reasonable, for example, to rely on Edward Abington, who had worked for the State Department in a diplomatic position, to testify as a fact witness about the committees.[7]  During summations, defense counsel made clear its strategy in selecting Abington:

> We know, we know in this courtroom who Edward Abington is, unlike somebody else.  And you know who I am talking about.  Edward Abington--30 years in the State Department as a diplomat abroad, American Consul General. He worked for the CIA. He was a Pentagon assistant chief of staff. He worked for the National Security Agency. He was the Chief of Mission, the President's personal representative dealing with foreign governments; the eyes and the ears of the

---

[6] Trial counsel for Elashi state in affidavits that they were ineffective by not investigating and pursuing Rule 15 depositions of these individuals.  *See* Affidavits of John Cline and Linda Moreno.  Both counsel, however, neglect to point out that all defendants, including their client, did in fact move for Rule 15 depositions of individuals from the Indictment Committees.  *See* ecf # 327 at 2-3, and *ex parte* Declaration of Joshua L. Dratel, dated July 10, 2006.  As evidenced by the motion, the government's response, and the correspondence to the Court on this subject, it was clear that it was the logistical hurdles of taking these depositions that prevented them from occurring – including meaningful administration of the oath, compliance with Fed. R. Civ. P. 28(b), and restrictions on the prosecutors' ability to travel to locations where the witnesses reside – rather than defense counsel's failure to pursue them.  *See* ecf # 335 and Appendix at 2-21 (correspondence to the Court on Rule 15 depositions).  Moreover, defendants' motion makes clear that in 2005, defense counsel "traveled to Israel and *met with some of the representatives of the entities named*."  *See* ecf # 327 at 11 n.3 (emphasis added).  Thus, the affidavits of counsel for Elashi proclaiming as ineffective their failure to investigate prospective witnesses from the committees are at best incomplete and misleading.

[7] Even if the defense lawyers had called no witnesses of their own, and only cross-examined the government's witnesses, that would have been a reasonable decision sufficient to defeat a claim of ineffective assistance of counsel.  *Harrington v. Richter*, 131 S. Ct. 770, 791 (2011) ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict.")

United States in Jerusalem and the occupied territories. He read and he spoke Arabic. He was vetted and approved by the White House.   He was the primary official to deal with Arafat on a daily basis. And he helped negotiate agreements between the Israelis and the Palestinians…. And he came here for free. He was not being paid for his testimony. Remember that? And he does not have a dog in this fight either. Because remember, he was loyal, working for and a lobbyist for the bitter rival, the bitter foe of Hamas. He was working for the Palestinian Authority, close to Yasser Arafat.

*See* R. 7/9706-07.  Clearly, the defense selected Abington because they could urge his unbiased, government credentials.

On the other hand, it would be reasonable to conclude that the individuals who submitted affidavits here would be dangerous witnesses to the defendants, and less reliable than Abington.  On cross-examination, for example, the affiants would have been presented with a wide variety of documentary evidence taken from the HLF offices, and from other co-conspirators, that demonstrated the HLF's association with Hamas and the committees' association with Hamas.  *See supra* at 7-12 (summarizing evidence from multiple sources establishing the indictment committees as part of the Hamas social wing).  Whereas defense counsel attempted to portray Abington as an unbiased U.S. government observer, the affiants' testimony here would have been portrayed as biased and self-serving.  In addition, their testimony would have opened the door to impeachment evidence going to their credibility that otherwise would have been inadmissible.  *See* ecf # 583 at 43-44, renewed May 30, 2008 (arguing that evidence of criminal proceedings against various Palestinians should be inadmissible).  Defense attorneys need not pursue witnesses that present a "double-edged sword," *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997), or who may be "harmful to the defense," *Harrington*, 131 S. Ct. at 789-90.  Here, the defense lawyers made rational decisions in

presenting Edward Abington (in addition to several other witnesses) to rebut the

government's evidence on the committees, particularly given the remote possibility that

the affiants now presented were able and willing to testify at trial.  Accordingly,

petitioners' reliance on these "uncalled" witnesses fails to establish constitutionally

deficient representation at trial.

### C.   Decision Not to Call Nathan Brown at the Second Trial

Just as it was a reasonable decision to rely on Edward Abington rather than to

focus on bringing witnesses from the West Bank, it was also reasonable not to present

multiple witnesses on the same subject.  As an initial matter, petitioners present no

evidence whatsoever that Nathan Brown, who testified in the first trial as an expert on the

subject of Palestinian civil institutions, was available for the second trial or willing to

testify a second time.  Without such evidence, petitioners' allegations must fail, as they

cannot show prejudice absent a showing that Brown would have in fact testified.  *See*

*Day*, 566 F.3d at 538, and cases cited *supra* at I.B.

Even if petitioners had presented evidence that Dr. Brown would have testified, it

was reasonable for defense counsel not to use him.  Brown testified that he had personal

experience with only one of the Indictment Committees, the Ramallah zakat committee.

R. 8/5369.  Before visiting the committee, he had his assistant call ahead and identify

Brown as an American academic.  R. 8/5495-96.  Brown could not remember the name of

the person he spoke to.  R. 8/5521.  On cross-examination, Brown conceded that Hamas

was reputed to have social organizations in the West Bank, but was unable to name any.

He was also unfamiliar with the leadership of the Indictment Committees, and had no

familiarity with the Elbarasse documents, the Philadelphia Conference, and other

evidence that directly contradicted his opinion. *See* R. 8/5453-5570.

Although petitioners claim that Brown "was the best, most effective witness from the first trial," Pet. Mem. at 10, that unsupported and subjective observation is merely the product of hindsight. As the Supreme Court warned in *Stickland* and *Richter*, [i]t is all too tempting to second guess counsel's assistance after conviction or adverse sentence." *Richter*, 131 S. Ct. at 788, (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks omitted). Objectively, it was reasonable for defense counsel to have concluded that Dr. Brown's credibility was damaged on cross-examination, or that Edward Abington, who also testified to personal experience with several of the Indictment Committees, *see* R. 7/9159-64, was more credible, more personable, and/or more likely to sway the jury by virtue of his prior government service. *See* R. 23/6214 ("Mr. Abington was as credible a witness as you will ever see -- a career State Department employee. He is from the government, just like these Prosecutors, and he has no ax to grind. He can't stand Hamas."). Petitioners cannot show that using Brown instead of Abington (even assuming Brown's availability and willingness to testify) amounted to incompetence under the prevailing norms or was otherwise deficient under the *Strickland* standard. Nor can they show that using one witness over the other would have affected the outcome of the trial. That is particularly so given the wealth of evidence establishing the Indictment Committees as part of Hamas. *See supra* at 7-12; *El Mezain*, 664 F.3d at 531-34 (detailing evidence of Hamas' control of the indictment committees).

### D. Alleged Failure to Challenge the Blocking Order

Petitioners contend (Pet. Mem. at 15-16) that trial counsel rendered ineffective assistance in litigating their motion to suppress evidence seized from HLF's premises.

That contention is incorrect; counsel's strategy in litigating the motion fell well within the boundaries of the *Strickland* standard.

### 1. Background

In December 2001, The Treasury Department's Office of Foreign Assets Control (OFAC), under the authority granted in IEEPA, designated HLF as a terrorist organization and issued a blocking order that prohibited, *inter alia*, any transaction involving the blocked property without a license from OFAC.  664 F.3d at 539-42. OFAC took possession of HLF's property and moved it to storage in order to "secure[] it to prevent unauthorized use, loss or destruction."  *Id.* at 544.  The government did not search or otherwise examine the property at that time.  *Id.* at 542.  The government then obtained a warrant to search HLF's property, based on an affidavit that "did not rely on, or refer to, evidence seized by OFAC from the HLF offices as a basis for probable cause to search."  *Id.* at 545.

Petitioners moved to suppress.  R. 2/1374 (ecf # 390, 1036).  Petitioners did not dispute the reasonableness of OFAC's blocking order and conceded that the government could lawfully have sealed HLF's offices; rather, petitioners focused instead on what they argued was the significantly greater intrusion of entering the offices and seizing the property without a warrant.  R. 2/1375, 1380-82; *see also* R. 2/4151-52.

The district court denied the motion, finding the government's actions to be reasonable by analogy to a recognized exception for administrative searches of closely regulated industries.  R. 2/4144; *El-Mezain*, 664 F.3d at 539.  The district court held in the alternative that the good faith exception to the exclusionary rule applied, because OFAC reasonably relied on IEEPA and the FBI reasonably relied on the search warrant

when it later searched the property.  R. 2/4150-53.

After briefing in the court of appeals was complete, the Ninth Circuit held in *Al-Haramain Islamic Found. v. United States Dep't of the Treasury*, 660 F.3d 1019 (9th Cir. 2011), that a warrant was required before OFAC could issue a blocking order under IEEPA.  *Id.* at 1043-48.  Petitioners' counsel promptly filed a letter pursuant to Fed. R. App. P. 28(j) arguing that *Al-Haramain* supported suppression of the evidence in this case.

The court of appeals affirmed the district court's denial of the motion to suppress, concluding that "the Government's movement of HLF's property from the HLF offices into a storage facility until it obtained a judicial warrant to search the materials did not infringe the defendants' Fourth Amendment rights."  664 F.3d at 545.  The court distinguished the Ninth Circuit's decision in *Al-Haramain*, on the ground that *Al-Haramain* addressed the "debilitating effect" of the blocking order itself, whereas in this case petitioners had not challenged the order itself but had focused instead on the physical entry into its premises and transfer of its assets.  *El-Mezain*, 664 F.3d at 543.

### 2.  Trial Counsel Reasonably Focused Their Efforts on the Documents in The Case

Trial counsel's decision to focus petitioners' suppression motion on the entry and seizure of the property, rather than on the blocking order itself, was neither deficient nor prejudicial under *Strickland*.

First, it is well settled that counsel's performance ordinarily is not objectively unreasonable if he fails to anticipate a development in the law.  *See, e.g., Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many times that

'[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop.'") (citation omitted; alteration in original).  At the time petitioners filed their suppression motion, no court had ever held that OFAC blocking orders required a warrant.[8]  Moreover, in a civil action filed by HLF before the criminal case, a district court in the District of Columbia had specifically rejected HLF's challenge to the designation and blocking order, while refusing to dismiss HLF's claim that the entry into its offices and seizure of its assets without a warrant violated the Fourth Amendment.  *See Holy Land Foundation for Relief and Development v. Ashcroft*, 219 F. Supp. 2d 57, 78-80 (D.D.C. 2002); *see also Islamic American Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 48 (D.D.C. 2005) (IEEPA blocking order "does not create a cognizable claim under the Fourth Amendment").  Given the state of the law at the time, it was reasonable for counsel to focus their challenge on the entry and seizure rather than the blocking order itself.

Second, petitioners' contention that the court of appeals would have found in their favor in light of *Al-Haramain* is pure speculation. Petitioners argue (Pet. Mem. at 15) that the court of appeals' decision in this case "implies that a challenge to the blocking order in this case would have been well founded."  The court of appeals' decision implies nothing of the sort.  While the court agreed with the Ninth Circuit's assessment of the significant effects of a blocking order, it did not address the ultimate issue of whether those effects would have outweighed the "Government's strong interest in combating terrorism," 664 F.3d at 545, and its "strong special need to act quickly to prevent asset flight," *id.* at 540.  In addition, the court of appeals relied on the fact that petitioners'

---

[8] The Ninth Circuit is the only court of appeals to have reached that conclusion.

interests were "adequately protected by the warrant obtained before the government actually searched the materials," which "added to the overall reasonableness of the Government's action and of the district court's denial of the defendants' suppression motion." *Id.* at 545.  That factor was not present in *Al-Haramain*.

Third, petitioners do not address the alternative grounds argued by the government for affirming the district court's denial of suppression.  Even if counsel had directly challenged the blocking order, the good faith exception to the exclusionary rule would apply, as the district court found, because OFAC reasonably relied on the authority of IEEPA.  *See Davis v. United States*, 131 S. Ct. 2419, 2426-28 (2011).[9]  In addition, as the government argued on appeal (Gov't Br. 126-27), the independent source doctrine precludes exclusion of the evidence because it was obtained pursuant to a warrant that was independent of OFAC's blocking and securing of HLF's property.  *See Murray v. United States*, 487 U.S. 533, 536-41 (1988).  In light of these alternative grounds, petitioners cannot establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

### E.  Alleged Failure to Raise a Selective Prosecution Defense

### 1.  Legal Standard

The "Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464

---

[9] *Al-Haramain* was a civil case, and the Ninth Circuit did not address whether the exclusionary rule or any other remedy would apply in a criminal case with respect to evidence obtained without a warrant from a designated terrorist pursuant to an OFAC blocking order.  Neither did the Ninth Circuit address the circumstances here, where the evidence was only searched pursuant to a warrant that was independent of the blocking order.

(1996) (internal citation omitted).  Prosecutorial decisions are entitled to a "presumption of regularity." *Id*; *United States v. Webster*, 162 F.3d 308, 333-334 (5th Cir. 1998). Accordingly, a defendant claiming selective prosecution "bears a heavy burden." *United States v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997); *see United States v. Lindh*, 212 F. Supp. 2d 541, 565 (E.D. Va. 2002) ("claims of selective prosecution are not easily established").

To discharge this formidable burden, "a defendant must demonstrate that the prosecution 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Wayte v. United States*, 470 U.S. 598, 608 (1985).  Meeting this burden requires the defendant to establish both (1) that "similarly situated individuals" outside of the protected group were not prosecuted, *Armstrong*, 517 U.S. at 465, and (2) that the decision to prosecute was "invidious or in bad faith." *Webster*, 162 F.3d at 333-334; *United States v. Hall*, 455 F.3d 508, 523 (5th Cir. 2006).

As evident by its terms, this standard is intended to be a "demanding" and "rigorous" one. *Armstrong*, 517 U.S. at 463, 468.  A defendant must offer "clear" and "credible" evidence in support of each prong of this test in order to establish a viable selective prosecution claim. *Armstrong*, 517 U.S. at 465, 470; *Hastings,* 126 F.3d at 314. Petitioners fail to satisfy either element of this burden.

## 2.  Trial Counsel Reasonably Chose Not To Pursue a Selective Prosecution Defense

Petitioners' claim that not raising selective prosecution constituted ineffective assistance fails because such an argument would have been frivolous.  Contrary to petitioners' contention, prosecutions under the material support statutes are not limited to

Muslims, and petitioners cannot point to any similarly situated individuals who were not prosecuted.   Moreover, given the wealth of evidence underpinning the charges in this case, petitioners have not, and cannot, demonstrate that the prosecution was motivated by a discriminatory purpose.

First, petitioners fundamentally err when they argue that, with respect to 18 U.S.C. § 2339B prosecutions, "virtually all of the prosecutions . . . are against Muslims." Pet. Mem. at 56.  The government has brought material support prosecutions against a range of individuals, without regard to religion, many of whom are not Muslim.   For example, the government has prosecuted numerous non-Muslim individuals for providing material support to the Fuerzas Armadas Revolucionarias de Colombia ("Revolutionary Armed Forces of Columbia" or "FARC"), *see, e.g., United States v. Mora-Pestana*, 496 Fed. Appx. 98, 2012 WL 3711341 (2d Cir. 2012)[10]; the Liberation Tigers of Tamil Eelam ("LTTE"), *see, e.g., United States v. Naidu*, 480 Fed. Appx. 180, 2011 WL 3705390 (4th Cir. 2011)[11]; and the Autodefensas Unidas de Colombia ("United Self Defense Force of Columbia" or "AUC"), *see e.g., United States v. Blanco Puerta*, 249 Fed. Appx. 359, 2007 WL 6774451 (5th Cir. 2007).[12]  Thus, the premise of petitioners' argument – that a *prima facie* selective prosecution argument exists because only Muslims have been

---

[10] *See also United States v. Bout*, 731 F.3d 233 (2d Cir. 2013); *United States v. Banol-Ramos and Alexis Freddy Mosquera-Renteria*, 516 Fed. Appx. 43, 2013 WL 1197722 (2d Cir. Mar. 26, 2013); *United States v. Rubio*, 677 F.3d 1257 (D.C. Cir. 2012); *United States v. Viglakis*, 2013 WL 4477023 (S.D.N.Y. 2013); *Caro v. United States*, 2010 WL 2219717 (S.D. Fla. 2010); *United States v. Vergara*, 612 F. Supp. 2d 36 (D.D.C. 2009).

[11] *See also United States v. Pratheepan Thavaraja, Murugesu Vinayagamoorthy, Vijayshanthar Patpanathan, Gaspar Rah Maria Paullan, Namiasivaya Viswanathan, Nachimuthu Socrates and Karunakaran Kandasamy*, 2009 WL 692113 (2d Cir. Mar. 18, 2009).

[12] *See also United States v. Fanny DeAmaris and Carlos Romero-Panchano*, 406 F. Supp. 2d 748 (S.D. Tex. 2005).

prosecuted under Section 2339B – is incorrect.

Second, petitioners contend[13] (Pet. Mem. at 16, 55-56 & Exh.4) that similarly situated individuals were not  prosecuted, pointing in particular to certain former government officials who, petitioners allege, advocated, in exchange for speaking fees, for the removal of the Mujaheddin-e Khalq ("MEK") from the list of designated terrorist organizations.[14]

However, in order to be "similarly situated" to the Holy Land defendants, the circumstances of these former officials must present no distinguishable, legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.  *Webster*, 162 F.3d at 334.  Petitioners cannot credibly argue that the circumstances here are remotely similar.  HLF was created for the sole purpose of financially supporting Hamas.  *See supra* at 3-7; *El-Mezain*, 664 F.3d at 527-31.  HLF and it officers were under the direction of the Palestine Committee, a sophisticated umbrella organization that sought to support Hamas through a network of organizations, including HLF, charged with varying missions calculated to comprehensively address Hamas' needs.  *Id*. at 527.  There were numerous financial transactions between HLF, petitioners, and Mousa Abu Marzook, who at the time was the political head of Hamas. R. 4/4306-07; GX Payments Between Marzook/Defendants; *El-Mezain*, 664 F.3d 527-28. For over a decade, HLF collected and sent millions of dollars to Hamas through the Hamas social infrastructure, while repeatedly lying to the public about its true purpose.

[13] Petitioners' evidence consists entirely of opinion pieces.  *See* Pet. Mem., Exh. 4.  For a contrary view, *see* http://www.nationalreview.com/articles/256689/mek-not-terrorist-group-michael-b-mukasey-tom-ridge-and-frances-fragos-townsend.

[14] The government delisted MEK on September 28, 2012.

*See* R. 4/4693-4700; *El-Mezain*, 664 F.3d at 528-31. In surveillance recordings and in Palestine Committee documents, HLF is recognized as the "official organization for Hamas fundraising in the United States." *Id*. at 527-28. It requires little analysis to conclude that prosecutors could easily distinguish between the vast financial support petitioners provided to Hamas and the speeches some former government officials have given arguing against MEK's designation. Accordingly, petitioners cannot make out even a *prima facie* claim of selective prosecution worthy of trial counsel raising as a defense.

Third, petitioners have not even attempted to present evidence demonstrating that prosecutors brought this case based on an improper motive, and indeed, the evidence is entirely to the contrary. During the *Kastigar* hearing that occurred prior to the first trial, the government detailed the sources of evidence underlying the indictment in this case. Agent Burns testified that the FBI first started investigating HLF and the individuals associated with it in 1994, as an intelligence investigation. *See* Transcript, June 26, 2007, at 5; *see also* R. 35/6214. Evidence for the case included conversations that were captured though court authorized wire taps, phone calls captured under the Foreign Surveillance Intelligence Act, phone records obtained through National Security Letters, bank records obtained by subpoena, witness interviews, and material seized through search warrants, among other evidence. *Id*. Petitioners make no showing whatsoever that the prosecution of this case was the result of anything other than following the voluminous evidence gathered through these myriad investigative tools demonstrating the commission of a crime. Other than claiming, incorrectly, that the government prosecutes only Muslims under 18 U.S.C. § 2339B, petitioners point to nothing to show that the

defendants' religion prompted their prosecution, rather than the evidence demonstrating they served as Hamas fundraisers in the United States.  Given that petitioners can satisfy no element of a selective prosecution claim, therefore, it would have been frivolous for trial counsel to have pressed it at trial.

Finally, in pre-trial motions, defense counsel made clear that not bringing a selective prosecution claim was a strategic choice.  Trial counsel opted instead to move *in limine*, and for an evidentiary hearing, on the theory that the government had criminalized religiously motivated conduct under the Religious Freedom Restoration Act ("RFRA").  *See* ecf # 584, renewed May 30, 2008, at 3 ("This is not a selective prosecution motion based on the prosecutor's motive, under which an entirely different, and more restrictive standard, would apply. … Rather, it is an assertion of a defense specifically provided for by Congress, arising from these defendants' right to the free exercise of their religion under RFRA and the First Amendment.")  Clearly, defense counsel considered a theory of selective prosecution, and reasonably rejected it, concluding as a matter of strategy that a motion predicted on RFRA had a better chance of success.  Such strategic choices cannot form the basis of a claim for ineffective assistance of counsel.  *Strickland*, 466 U.S. at 690-91.[15]

### F.  Alleged Failure to Seek Order Compelling Disclosure of Exculpatory Evidence

Petitioners argue that trial counsel were ineffective because they failed to seek

---

[15] Because petitioners have failed to establish even a *prima facie* case, the Court *a fortiori* should deny petitioners perfunctory request for discovery, Pet. Mem. at 56.  *Armstrong*, 517 U.S. at 465 (explaining exceptionally high burden for obtaining discovery on selective prosecution claims; *Webster*, 162 F.3d at 333-334 (denying discovery where petitioner had not made out even *prima facie* claim of selective prosecution).

orders requiring the prosecution to locate for defense counsel allegedly exculpatory

evidence (a) among the intercepted phone calls made available to defense counsel, and

(b) among materials not in the government's possession, but allegedly existing in Israel.

That claim should be rejected.  First, trial counsel did in fact make substantial arguments

in attempting to obtain exculpatory evidence for petitioners.  Second, there would have

been no basis for an order requiring the government to search the relevant materials,

because they were either turned over to cleared defense counsel (the phone calls) or not

in the possession of the prosecution (the Israel material).[16]   Finally, because petitioners

have identified no such exculpatory material, they cannot demonstrate prejudice.  With

respect to the defendants' intercepted telephone calls, petitioners concede that their trial

counsel made significant efforts to have defendants themselves obtain access to the calls

that remained classified.  Pet. Mem. at 16; ecf # 361, #1036; ecf # 633, #1036; *El-*

*Mezain*, 664 F.3d at 518-525 (addressing production of the defendants' intercepted

statements and finding no error).  Indeed, it is undisputed that the government

declassified summaries of the calls deemed pertinent, declassified the entire contents of

the intercepts for four of eight FISA subjects, and produced all of that declassified

material to the defendants.  *El-Mezain*, 664 F.3d at 518.  Similarly, it is undisputed that

for the remaining FISA subjects, the government produced the entirety of the intercepts

to the defense counsel in classified form, and that defense counsel possessed the security

---

[16] Petitioners suggest, in one sentence, that "the Israeli Defense Forces are aligned with the government and are agents of the government for purposes of this *Brady* analysis."  Pet. Mem. at 53. That contention is incorrect.  The government of Israel did not jointly investigate the petitioners or act as an agent of the U.S. government, and petitioners present no evidence to the contrary.  *See United States v. Reyeros*, 537 F.3d 270, 283 (3d Cir. 2008) (responding to a request from the United States for investigative or judicial assistance in accordance with treaty did not make the government of Colombia an agent of the prosecution.)

clearances necessary to receive the classified material.  In addition, the government offered to declassify any specific calls that counsel identified.  *Id*. at 518-519.  In short, cleared counsel for the petitioners had access to the entirety of the intercepted material.

To the extent that any of the intercepted material contained exculpatory information (and petitioners identify none, despite having the most knowledge of their own statements), the government satisfied its *Brady* obligation by making the material available to the defense.  There is simply no requirement that "the government's *Brady* obligations require it to point the defense to specific documents with[in] a larger mass of material that it has already turned over."  *United States v. Mulderig*, 120 F.3d  534, 541 (5th Cir. 1997), citing *U.S. v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990) ("While the Supreme Court in *Brady* held that the Government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case.").  A failure to seek an order for the government to do what this Circuit has already held is not required cannot constitute ineffective assistance of counsel.[17]

The same is true for the materials provided by the Government of Israel.  Again, it is undisputed that trial counsel attempted to gain access to the warehouse of materials seized by the Israeli government during Operation Defensive Shield.  *El-Mezain*, 664 F.3d at 516-518 (addressing the district court's denial of defendants' motion to issue a

---

[17] Even if petitioners could credibly claim that trial counsel should have made a motion to have the prosecution find evidence that defendants attempted to comply with the law, Pet. Mem. at 21, they fail to establish prejudice from the failure to do so.  Trial counsel relied on an intercepted call to argue precisely this point, *see* GX Baker Wiretap 11, and a witness whose entire testimony was intended to show that the defendants attempted to comply with the law.  *See* R. 7/8495-8516. The jury, however, was not convinced.  There is no reason to believe that cumulative evidence to the same point would have had any greater impact, or led to a different result.

letter rogatory).  As the Fifth Circuit found, "[t]he defendants' hope that combing through all 2000 boxes of the seized material might have produced exculpatory evidence is purely speculative."  *Id*. at 517.  This was true based on (a) the fact that the government produced to the defense all the material that its expert, Avi, used to form his expert opinion; (b) Avi's testimony in response to defense counsel's questioning during a separate hearing outside the presence of the jury, in which he stated that he produced all the seized material that was relevant to the indictment committees, regardless of whether it was favorable to the government[18]; and (c) the fact that defense counsel did not elicit testimony from Abington indicating in which committee he allegedly saw "pro-Fatah" material.  *Id*. at 517-518.  Given the Fifth Circuit's emphatic rejection of trial counsel's arguments that it was error not to permit them to review all the Defensive Shield materials in Israel, it makes little sense to assume that seeking an order to require the prosecutors to do the same would have resulted in a different outcome.

### G.  Alleged Failure to Raise an Entrapment Defense

Petitioners contend (Pet. Mem. at 17-20) that defense counsel rendered ineffective assistance by not raising an entrapment defense.  That contention has no merit.  None of

---

[18] *See* R. 7/8518-59.  Avi testified repeatedly that he did not cherry pick information favorable to the prosecution; everything he took from the warehouse that related to the indictment committees, with the exception of irrelevant material that he left behind such as school grades and utility bills, he turned over to the prosecution.  R. 7/8534, 8537, 8547.  With regard to Abington's testimony that he saw a poster of Arafat in a zakat committee -- the only evidence petitioners cite to suggest that exculpatory evidence must exist -- Avi testified that he did see a poster of Arafat among the Defensive Shield documents at the warehouse.  R. 7/8538-39.  However, he did not take it because it did not come from a committee that he was researching.  *Id*.  Indeed, Avi testified that the picture he saw came from a committee called Beit Zahul, which is not one of the indictment committees.  R. 7/8546.  Because petitioners cite no evidence that exculpatory information exists from the indictment committees, their insistence on a search of over 2000 boxes was, as the district court found, a mere fishing expedition.  R. 7/8558-59; *El-Mezain*, 664 F.3d at 518.  Petitioners plainly cannot demonstrate prejudice from the court not permitting such a venture, regardless of whether defense counsel or the government did the fishing.

the petitioners had a viable entrapment defense, and there were sound tactical reasons for

not presenting one.  The record conclusively shows that counsels' performance was

neither deficient nor prejudicial under the *Strickland* standard.

Entrapment "is a relatively limited defense."  *United States v. Russell*, 411 U.S.

423, 435 (1973); *see also id.* (The entrapment defense "was not intended to give the

federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it

[does] not approve.").  "Entrapment only arises . . . where the Government, in its zeal to

enforce the law, implant[s] in an innocent person's mind the disposition to commit a

criminal act, and then induce[s] commission of the crime so that the Government may

prosecute."  *United States v. Gutierrez*, 343 F.3d 415, 419 (5th Cir. 2003) (internal

quotation marks and citation omitted).  Entrapment "has two related elements:

government inducement of the crime, and a lack of predisposition on the part of the

defendant to engage in criminal conduct."  *Mathews v. United States*, 485 U.S. 58, 63

(1988); *Gutierrez*, 343 F.3d at 419.  Before he will be entitled to an entrapment

instruction, a defendant bears the burden of presenting evidence on both the government-

inducement and lack-of-predisposition prongs of the entrapment defense.  *United States

v. Ogle*, 328 F.3d 182, 185 (5th Cir. 2003).

### 1.  The Government Did Not Induce Petitioners' Crimes

The government's conduct amounts to inducement when it was "such that a law-

abiding citizen's will to obey the law could have been overborne."  *United States v.

Glover*, 153 F.3d 749, 754 (D.C. Cir. 1998) (citation omitted).  It is not sufficient to show

that the government solicited or provided an opportunity to commit the offense; the

government must have engaged in more substantial inducements such as intimidation,

threats, forceful or repeated solicitation, or manipulation of sympathy or other powerful emotions.  *Gutierrez*, 343 F.3d at 420 & n.13.

Petitioners fail to show, or even allege, that the government engaged in conduct that amounts to "inducement" under that standard.  The basis of petitioners' entrapment claim (Pet. Mem. at 19) is that the government could have provided clear guidance regarding the zakat committees -- either by specifically designating them as Hamas entities or by publishing a "white list" of entities that could lawfully be supported – but chose not to do so in order to trick the defendants into unwittingly supporting Hamas. Petitioners' inducement argument fails for several reasons.

First, petitioners cite no authority supporting their claim that the government's failure to provide clear guidance can amount to "inducement" for purposes of an entrapment defense.  The government did not solicit the offenses, nor did it provide an opportunity or otherwise facilitate the offenses, nor did it intimidate, threaten, or take any other affirmative action to persuade the defendants to contribute to Hamas-controlled entities.[19]

Second, petitioners fail to point to any evidence to support their claim that the government's decision not to separately designate every component of a terrorist organization and not to provide a "white list" was designed to induce petitioners into

---

[19] Petitioners do not contend that counsel were ineffective for failing to raise the distinct defense of "entrapment by estoppel."  *See United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996) ("The defense of entrapment by estoppel is applicable when a government official or agent actively assures a defendant that certain conduct is legal and the defendant reasonably relies on that advice and continues or initiates the conduct.").  But even if petitioners had raised that claim, it would fail because the record does not support an inference that any government official "actively assure[d]" petitioners that contributions to Hamas-controlled entities were legal unless those entities were separately designated.  To the contrary, petitioners concede (Pet. Mem. at 19) that government officials did not provide them with any such assurance.

violating the law.  In fact, the record directly refutes that claim, because it establishes that the government had valid reasons behind those policies.  Government expert Matthew Levitt explained that it would be impossible and counterproductive for the government to attempt to include every sub-group on the designation list or to provide a "white list" of approved organizations.  He further explained that, under the government's policies, it is clear that "the omission of a sub-group from the designation list does not mean that the group is not part of Hamas or that American citizens may donate money to the sub-group."  *El-Mezain*, 664 F.3d at 512.

Third, the jury, in finding petitioners guilty of willfully violating IEEPA by sending money to the committees, necessarily rejected the factual basis of petitioners' entrapment claim.  All the evidence that petitioners now claim would have established an entrapment defense – *i.e.*, evidence tending to show that petitioners believed it was lawful to donate to the committees as long as they were not specifically designated -- was presented at trial, and petitioners' trial counsel argued vigorously that this evidence negated their criminal intent.  *See El-Mezain*, 664 F.3d at 554-55; R. 7/9564-71, 75-83.  The jury rejected those arguments and convicted petitioners on all counts.  There is no reason to believe that the jury would have embraced petitioners' version of the facts if counsel had packaged it as "entrapment" rather than as undermining proof of their intent.

### 2.  Petitioners were predisposed to provide material support to Hamas

Even if petitioners could point to evidence of inducement, which they cannot, their entrapment defense would have failed because the evidence that they were predisposed to commit the charged offenses was overwhelming.

Predisposition "focuses upon whether the defendant was an 'unwary innocent' or,

instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Matthews*, 485 U.S. at 63.  The government must prove "a state of mind which readily responds to the opportunity furnished by the officer or his agent to commit the forbidden act." *Burkley*, 591 F.2d at 916.

Petitioners' predisposition to provide material support to Hamas is evident from petitioners' history of supporting Hamas.  As set forth *supra* at 3-12, and as the court of appeals found, the evidence showed that petitioners had a long-standing relationship with Hamas, that they supported its cause, and that they established HLF to serve as "a fundraising entity for Hamas." *El Mezain*, 664 F.3d at 530.  The weight of this evidence was such that "a jury could not help but infer . . . that the defendants had a close association with Hamas and that HLF acted to fund Hamas both before and after Hamas's designation as a terrorist organization." *Id.* at 531.  Elashi's suggestion during a phone call that he would not contribute to designated entities, relied on by petitioners (Pet. Mem. at 19-20), does nothing to dispel the overwhelming evidence of predisposition, in light of the evidence that petitioners engaged in secrecy, speaking in codes, and other deceptive practices to mask their connections with Hamas, and that they continued supporting the same entities, which they knew were controlled by Hamas, both before and after the designation.  664 F.3d at 529.

**3.  There Were Strategic Reasons For Not Raising Entrapment**

Even if, *arguendo*, petitioners' entrapment defense had some merit, there were sound strategic reasons for not raising it.  Raising an entrapment defense in this case would have been in tension with petitioners' argument (which petitioners continue to assert on collateral review) that they did not commit the offenses because the committees

were not in fact controlled by Hamas.  *See Mathews*, 485 U.S. at 63 ("[E]ntrapment presupposes the commission of a crime [and] a jury could not logically conclude that the defendant had both failed to commit the elements of the offense *and* been entrapped."). For example, petitioners argued at trial that, if there were evidence that the committees were controlled by Hamas, the Treasury Department would have designated them, and therefore the fact that Treasury did *not* designate them was substantive proof that the committees were not connected to Hamas.  *See, e.g.,* R. 7/9563-70; *see also id.* at 9566-67 (arguing to the jury that the committees "aren't controlled by Hamas . . . [a]nd the Treasury Department told you that by not putting – never putting a single one of the zakat committees and charitable societies on the [designation] list").  But that argument is in tension with the entrapment theory petitioners now raise on collateral review, which posits (Pet. Mem. at 19-20) that the government decided not to directly designate the committees not because there was no evidence connecting them to Hamas, but because the government, knowing the committees were connected to Hamas, wanted to trick petitioners into violating the law.

In addition, an entrapment instruction would have put petitioners' predisposition to support terrorism directly at issue.  *See United States v. Armendariz-Mata*, 949 F.2d 151, 154-55 (5th Cir. 1991); *see also United States v. Nevile*, 82 F.3d 1101, 1107 (D.C. Cir. 1996) (holding that extrinsic evidence of prior bad acts is admissible to prove predisposition).  Such an instruction might have jeopardized petitioners' efforts to exclude under Federal Rule of Evidence 403 evidence of petitioners' support for violent terrorism.  *See* Gov't Br. 87-88 (citing examples of district court rulings excluding such evidence under Rule 403).  In short, petitioners' ineffective assistance claim is foreclosed

because, not only was there no merit to an entrapment defense, but there were sound strategic reasons to avoid it.

### H.  Alleged Failure to Pursue a Mistake of Law Defense

Petitioners contend (Pet. Mem. at 20) that counsel should have pursued a "mistake of law" defense, "based on the meeting with the officials where the defendants were led to believe that contributions to the Zakat Committees were not prohibited."  That contention has no merit.

Petitioners fail to explain how their proposed "mistake of law" defense was not effectively presented by trial counsel through their challenge to the "willful" intent element of the IEEPA counts.  To establish a willful violation of IEEPA, the government must prove that the defendant acted with knowledge that his conduct was unlawful.  *See Bryan v. United States*, 524 U.S. 184, 192 (1998); *United States v. Elashyi*, 554 F.3d 480, 505 (5th Cir. 2008).  Accordingly, the district court correctly instructed the jury that "willful" conduct is something done "purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." R. 17/1113.  As with petitioners' entrapment claim, petitioners' counsel presented all the evidence that petitioners now claim would support a "mistake of law" defense to the jury, and argued strenuously that this evidence precluded a finding of willful intent as defined in the instructions.  *See* R. 7/9529-30 (arguing that petitioners did not act "willfully" because they "clearly intended to obey" the law); *id.* at 9669 (arguing that petitioner Elashi was "an innocent man trying to follow the law.  Take a look at that willfulness instruction."); *id.* at 9678-9683 (arguing that evidence shows that petitioners did not act willfully, because they "had every intention of following [the law]").  There was nothing

unreasonable about counsel's decision to present these facts as negating their willful intent rather than as a "mistake of law" defense. *Cf. United States v. Rochester*, 898 F.2d 971, 978 (5th Cir.1990) ("failure to instruct on good faith is not fatal when the jury is given a detailed instruction on specific intent and the defendant has the opportunity to argue good faith to the jury").

In addition, the factual basis for any mistake-of-law defense was undermined by petitioners' suspicious conduct, which reflected knowledge of its illegality. *See El-Mezain*, 664 F.3d at 529 (noting petitioners' suspicious statements, including speaking in code, and other "deceptive practices"); *United States v. Schultz*, 333 F.3d 393, 412 (2d Cir. 2003) (district court properly rejected mistake of law instruction where defendants "demonstrated a keen awareness of the illegality of their actions" by, among other things, "communicating in 'code'"). Finally, the jury, by finding petitioners guilty of offenses requiring "willful" conduct, necessarily rejected petitioners' claim that they believed that their conduct was lawful – a claim which is the factual basis of petitioners' mistake-of-law argument. Accordingly, petitioners cannot show that the failure to pursue that argument was prejudicial.

## I. Alleged Failure to Argue Vagueness

Petitioners further contend that trial counsel rendered ineffective assistance by failing to raise a claim that 18 U.S.C. § 2339B and 50 U.S.C. §§ 1701-1706 were unconstitutionally vague as applied in this case to defendants who donated directly only to entities that were not specifically designated. Pet. Mem. at 21-22. That contention has no merit because, contrary to petitioners' suggestion, trial counsel in fact raised this claim.

Before the first trial, petitioners' counsel filed a written motion to dismiss certain counts of the indictment, in part on the ground that Section 2339B is unconstitutionally vague as applied to defendants who donated to entities that were not separately designated.  R. 2/1850, ecf ## 392, 1036.  The vagueness argument covers seven pages and echoes the argument petitioners now claim counsel were ineffective for failing to raise.  *Compare* R. 2/1865-73 (ecf # 392) *with* Pet. 21-22.  The government filed a response, R. 2/2153 (ecf # 416), and petitioner filed a reply, R. 2/2550 (ecf # 451), as well as a supplemental motion, R. 2/2828 (ecf # 488), contending that the counts based on IEEPA were also unconstitutionally vague.  The district court denied the motions in a written order.  R. 2/4598-99 (ecf # 650).  Petitioners' habeas petition does not cite any of these documents.

Of course, the fact that trial counsel raised the vagueness claim forecloses petitioners' argument that trial counsel were ineffective for not raising it.[20]  Petitioners do not raise the vagueness issue directly (i.e. independent of an ineffective assistance of counsel claim).  But even if they had, the claim would fail.  Because the vagueness issue was litigated on direct review, petitioners may not re-litigate it in this collateral proceeding.  *United States v. McCollom*, 664 F.2d 56, 59 (5th Cir. 1981).

## II.    APPELLATE COUNSEL EFFECTIVELY REPRESENTED PETITIONERS ON APPEAL

Claims of ineffective assistance of counsel on appeal are governed by the *Strickland* standard.  To establish ineffective assistance of counsel under *Strickland*,

---

[20] This fact also calls into question the credibility of the affidavit from trial counsel Nancy Hollander, in which Ms. Hollander declares that trial counsel's failure to raise the vagueness issue amounted to ineffective assistance of counsel.  Hollander Affidavit at 3-4.  Ms. Hollander signed the pretrial motion in which this issue was in fact raised.  R. 2/1876.

petitioners must show both deficient performance and prejudice.  466 U.S. at 687.

Counsel's performance is deficient if it falls below an objective standard of

reasonableness, after viewing the attorney's representation with a strong presumption of

reasonableness. *Id.* at 687-689. Counsel's error is prejudicial if there is a reasonable

probability that the outcome of the proceeding would have been different absent the

deficient performance. *Id*. at 694.

　　　Where the alleged error is the omission of a particular claim from the brief filed

for a defendant on his direct appeal, a reviewing court must recall that the "process of

'winnowing out weaker arguments on appeal and focusing on' those more likely to

prevail, far from being evidence of incompetence, is the hallmark of effective appellate

advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463

U.S. 745, 751-752 (1983)); *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[I]t is

still possible to bring a *Strickland* claim based on counsel's failure to raise a particular

claim, but it is difficult to demonstrate that counsel was incompetent").  Counsel is

permitted to use his professional judgment to focus on the most worthy issues.  *Buehl v.*

*Vaughn*, 166 F.3d 163, 173-74 (3d Cir. 1999) ("One element of effective appellate

strategy is the exercise of reasonable selectivity in deciding which arguments to raise.").

A defendant must show that "a particular nonfrivolous issue was clearly stronger than

issues counsel did present," and there is a "strong presumption" that appellate counsel's

"attention to certain issues to the exclusion of others" reflects a reasonable tactical choice

rather than "sheer neglect."  *Dorsey v. Stephens*, 702 F.3d 309, 320 (5th Cir. 2013); *see*

*also id.* ("[A]ppellate counsel who files a merits brief need not (and should not) raise

every nonfrivolous claim, but rather may select among them in order to maximize the

likelihood of success on appeal.").

Petitioners were vigorously represented by their counsel on direct appeal. Appellate counsel filed hundreds of pages of briefing – classified and unclassified – raising more than twenty separate legal claims.  At the close of the two-hour oral argument, the Fifth Circuit panel complimented both sides on the quality of the briefs and argument.  The court of appeals affirmed petitioners' convictions and sentences in a 170-page published opinion, in which the panel found that several of the claims of error raised by appellate counsel were meritorious, although the court found the errors harmless in light of the strength of the evidence and the fundamental fairness of the trial.  *El-Mezain*, 664 F.3d at 484.  Appellate counsel then filed lengthy petitions for rehearing en banc and for certiorari, both of which were denied.

### A.  Sufficiency of Evidence

Petitioners contend (Pet. 22-41) that appellate counsel were ineffective because they failed to argue on appeal that the evidence that Hamas controlled the zakat committees was insufficient to support their convictions.  That contention has no merit.

It was entirely reasonable for counsel to "winnow" the issues on appeal by omitting a challenge to the sufficiency of the evidence, because such a challenge would have been meritless.  *See Williams v. Collins*, 16 F.3d 626, 635-636 (5th Cir. 1994) (finding no ineffective assistance where counsel did not raise a meritless issue on appeal).  First, the standard of review for claims of insufficiency of evidence is highly deferential to the jury's verdict.  The court of appeals will uphold a jury verdict if "any reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt."  *United States v. Hayes*, 342 F.3d 385, 389 (5th Cir. 2003); *see also Jackson v.*

*Virginia*, 443 U.S. 307, 318-19 (1979). It views "'the evidence in the light most favorable to the prosecution and accept[s] all reasonable inferences that tend to support the verdict.'" *United States v. Williams*, 610 F.3d 271, 290 (5th Cir. 2010) (quoting *United States v. Brodnax*, 601 F.3d 336, 343 (5th Cir. 2010)).  Thus the inquiry is only "whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."  *United States v. Ramos-Cardenas*, 524 F.3d 600, 606 (5th Cir. 2008) (internal quotation marks and citation omitted).

Second, the court of appeals' analysis of the harmless error question makes clear that the court would have rejected the argument that there was insufficient evidence of Hamas control of the committees to sustain the convictions.  After the court of appeals concluded that certain evidence tending to show Hamas control of the committees should not have been admitted, the court carefully scrutinized the strength of the government's other evidence on that issue.  *El-Mezain*, 664 F.3d at 531-35.  In a section helpfully entitled "Hamas's control of the zakat committees," which petitioners do not cite in claiming (Pet. Mem. at 31) that there was "very little evidence actually addressing the issue" of "Hamas's control of the Zakat Committees," the court found that the "large amount" of evidence on that point was so "formidable" as to "preclude[] a finding that the errors complained of had a substantial influence on the jury."  664 F.3d at 535. Because the court concluded that the properly admitted evidence of Hamas control was so "formidable" as to render the errors harmless, it follows *a fortiori* that the court would have found that evidence sufficient under the far more lenient *Jackson* standard.

Petitioners contend (Pet. Mem. at 31-41) that the evidence relied on by the court of appeals was insufficient to establish Hamas control of the committees, because it

consisted merely of conclusory statements that certain members of the committees were also Hamas members and because there was insufficient detail regarding the internal mechanisms of the committees and how they were controlled to support an inference that the mere presence of Hamas members on the committee indicated that Hamas actually controlled the committee.  Petitioners are wrong; there is nothing "conclusory" about the mountain of evidence proving that the committees were controlled by Hamas.

First, the evidence established, as the court of appeals found, that HLF "function[ed] as a fundraising entity for Hamas."  664 F.3d at 530; *see also id.* at 527-31 (reviewing trial evidence and concluding that "a jury could not help but infer" that HLF was a fundraising arm for Hamas, both before and after Hamas's designation as a terrorist organization).  That fact is itself powerful evidence that the committees to which HLF gave so much money were also part of Hamas.

Second, the government's expert witnesses testified in detail regarding Hamas's efforts to obtain control of charitable committees and other institutions by installing a critical mass of Hamas members in the controlling positions of those institutions.  *See, e.g.*, R. 4/3836; 7/7906; 7/8046-69.  Rather than making merely "conclusory" statements, these experts identified specific individuals who served in leadership positions in each of the committees and provided evidence from numerous primary sources, including large quantities of Hamas materials seized from the committees, that those individuals were Hamas leaders and members and that the committees' activities supported Hamas's social and propaganda purposes.  *See* 664 F.3d at 531-35; *see also, e.g.*, R. 7/8049-69; GX ICS Hebron 1.2.6,7,11,12; GX Jenin Zakat 1,6; GX Nablus Zakat 1,2,3,6.

Finally, documents associated with HLF and recorded statements at HLF's

"Philadelphia meeting" named specific committees and their leadership and discussed the extent to which, by virtue of those leaders, the committees could be considered as "ours." (i.e. controlled by Hamas).  *See* 664 F.3d at 534; *see also* GX Elbarasse Search 22; Ashqar Search 5; GX Philly Meeting 13E.

In light of all of this evidence, there is no reason to conclude that counsel's "winnowing" of the issues for appeal by omitting this plainly meritless sufficiency claim was "an unreasonable [decision] that only an incompetent attorney" would have made, *see Garrett v. United States*, 78 F.3d 1296, 1305 (8th Cir. 1996), or otherwise represented anything other than a tactical choice falling "well within the 'wide range of professionally competent assistance' required under the Sixth Amendment."  *Smith v. Murray*, 477 U.S. at 536 (quoting *Strickland*, 466 U.S. at 690).

### B.  Vagueness

Petitioners further contend (Pet. Mem. at 42) that appellate counsel rendered ineffective assistance by failing to claim on appeal that 18 U.S.C. § 2339B and 50 U.S.C. §§ 1701-1706 were unconstitutionally vague as applied to petitioners who donated directly only to entities that were not specifically designated.  That contention likewise fails.  Counsel were not ineffective for failing to raise this issue on appeal, because it has no merit.

"A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2718 (2010)

Contrary to statements in the petition, petitioners did raise in district court a

vagueness challenge to Section 2339B as applied to donations to entities that were not separately designated.  R. 2/1850 (ecf ## 392, 1036).  The district court correctly rejected that argument, recognizing that a constitutional ruling making it "lawful to support a terrorist organization as long as the money is funneled through a subsidiary or affiliate that has not been independently designated" would allow "anyone intelligent enough to launder donations" through undesignated front groups to "give financial support to terrorist organizations without legal consequences."  R. 2/4598 (ecf # 650).  Such contributions are clearly prohibited under the statute, as the Supreme Court recognized in *Humanitarian Law Project*, even when the donations are intended to serve the charitable purposes of the terrorist organization's ostensibly charitable subgroups.  *See* 130 S. Ct. at 2725-26 (holding that Congress may constitutionally prohibit support for terrorist group's allegedly separate legitimate activities, because terrorist groups, including Hamas, are able to "use [their] overt political and charitable organizations as a financial and logistical support network for [their] terrorist operations").

Moreover, the district court reasoned, the statute plainly provides sufficient notice to a person donating to a group he knows is controlled by a terrorist organization, because "[i]t requires no extraordinary acumen to realize that funneling money to an organization operated by or on behalf of a specially designated terrorist organization" violates the statute.  R. 2/4598 (ecf # 650); *see also Humanitarian Law Project*, 130 S. Ct. at 2720 (rejecting vagueness challenge to § 2339B in part because "the knowledge requirement of the statute further reduces any potential for vagueness"); *United States v. Farhane*, 634 F.3d 127, 138-41 (2d Cir. 2011) (rejecting vagueness challenges to § 2339B).  Thus, the district court was plainly correct in rejecting petitioners' vagueness challenge, and

counsel did not render constitutionally ineffective assistance in choosing not to raise the issue on appeal.

### C. Writ of Certiorari

Petitioners contend (Pet. Mem. at 42) that counsel were constitutionally ineffective in failing to argue in their petition for a writ of certiorari in the Supreme Court that the court of appeals, in conducting its harmless error analysis, erroneously viewed the evidence in a light favorable to the government.  That contention is frivolous, because it is well established that there is no constitutional right to effective assistance of counsel in filing a petition for certiorari in the Supreme Court.  *Ross v. Moffitt*, 417 U.S. 600, 617-18 (1974); *Clark v. Johnson*, 227 F.3d 273, 283 (5th Cir. 2000).  In addition, petitioners have not even attempted to show a reasonable probability that they would have obtained a writ of certiorari on that factbound issue.

### III.   THE FIFTH CIRCUIT DOES NOT RECOGNIZE AN "ACTUAL INNOCENCE" DEFENSE, AND IN ANY EVENT THE EVIDENCE AT TRIAL ESTABLISHED PETITIONERS' GUILT BEYOND A REASONABLE DOUBT

Petitioners attempt to raise a freestanding claim of "actual innocence." As petitioners readily admit, however, the Fifth Circuit does not recognize such a claim.  Pet. Mem. at 43, citing *In re Swearingen*, 556 F.3d 344 (5th Cir. 2009).  Even if it did, the argument would be foreclosed here.  The factual basis for petitioners' claim of innocence is that "the government presented no evidence proving that Hamas controlled the Zakat Committees."  Pet. Mem. at 49.  But that argument is foreclosed by the mountain of evidence introduced at trial demonstrating Hamas' control over Indictment Committees. *See supra* at 7-12, and *El-Mezain*, 664 F.3d at 527 n.18, 531-535.  Moreover, trial

counsel for petitioners repeatedly argued to the jury that the evidence was insufficient to conclude that the Indictment Committees were controlled by Hamas, and yet the jury found beyond a reasonable doubt that they were. Petitioners are procedurally barred from rearguing this claim under the guise of "actual innocence." And, to the extent petitioners believe their trial counsel were constitutionally ineffective in the way they presented the argument, that claim also lacks merit, for the reasons described above. *See supra*, I.A. and B.

Even had the petitioners successfully presented the witnesses whose affidavits they now submit, it would have made no difference. These declarations proffer self-serving and generalized conclusions not subjected to cross-examination. Nor do they address the wealth of documentary evidence establishing Hamas' control over the committees. For example, declarants from the Islamic Charitable Society of Hebron do not attempt to address why the head of that society, Abdel Khaleq al-Natsheh, was introduced at a ceremony as the head of Hamas in Hebron. *El-Mezain*, 664 F.3d at 532-33; ICS Hebron 12. Nor do they explain why a Palestine Committee letter to "Shukri" states that with respect to ICS Hebron, "all of it is ours," Elbarasse Search 22, or why al-Natsheh's name appears in Hamas leader Mousa Abu Marzook's phone book, GX Marzook Phone Book, or why Hamas political documents were found in al-Natsheh's desk at the committee, ICS Hebron 1, 2, 5, or why multiple posters of Hamas martyrs were found at the committee, ICS Hebron 6, 7, 8, 9, 10, 11. *See El-Mezain*, 664 F.3d at 533. Nor do the affiants explain why HLF, whose demonstrated mission was to support Hamas, would send millions of dollars to their committee if it was not controlled by Hamas.

Trial counsel had good reason for not bringing these witnesses to testify, *supra* at I.B.  Even under the *Schulp* standard for actual innocence (not applicable here), it is not enough to "merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather [a petitioner must convince a court]that no reasonable juror would have found the defendant guilty." *Schlup,* 513 U.S. 298, 329 (1995).  *See Reed v. Stephens,* --- F.3d ----, 2014 WL 103648, at * 7 (5th Cir. 2014).  As the Fifth Circuit stated with respect to the evidence here, "[o]ur review of the evidence . . . convinces us of the overwhelming nature of the connection between HLF, the zakat committees, and Hamas. . . . We believe that a jury could not help but infer from the above evidence that the defendants had a close association with Hamas and that HLF acted to fund Hamas both before and after Hamas's designation as a terrorist organization." *El-Mezain*, 664 F.3d at 527 n.18, 531. Not only is a freestanding "actual innocence" claim unavailable to petitioners, it is also unavailing in light of the overwhelming nature of the evidence presented at trial.

## IV.     PETITIONERS' ALLEGATIONS OF *BRADY* VIOLATIONS ARE PROCEDURALLY BARRED AND IN ANY EVENT MERTILESS

Petitioners do not allege as part of Ground Four that trial counsel rendered ineffective assistance of counsel with respect to raising *Brady* violations.  Petitioners made that allegation as part of Ground One, part f, and the government rebutted it.  *See supra*, Part I.F.  Petitioners' freestanding claim of *Brady* violations, therefore, is procedurally barred because it could have been raised as part of the appeal of this case and it was not.  *See Torres*, 163 F.3d 909 at 911 (5th Cir. 1999).  This procedural default can only be overcome if a petitioner demonstrates both cause for the default and actual

prejudice as a result.  *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991).

Petitioners make no effort to satisfy this standard.  Instead, they repeat allegations made

earlier in their petition speculating that exculpatory information must exist among the

intercepted calls turned over to cleared defense counsel, and that exculpatory evidence

must exist in the warehouse in Israel, relying only on the same testimony from Abington

about a photograph of Yasir Arafat.  Pet. Mem. at 52-53.

Even if petitioners had attempted to justify their procedural default, which they

have not, the allegations of *Brady* violations are entirely without merit.  As explained

above, the government did not suppress any of the FISA intercepts.  To the contrary, the

prosecution turned over all of the defendants' FISA intercepts, whether classified or not,

to cleared counsel.  *See El-Mezain*, 664 F.3d at 523-524.  As to the materials provided to

the prosecution by the Government of Israel, all of it was produced to the defense.

Petitioners present no evidence that exculpatory information exists elsewhere in the

warehouse in Israel, and Abington's testimony does not suggest otherwise.  Abington did

not identify which committee allegedly housed the Arafat photo, and Avi testified that he

saw such a poster from a committee called Beit Zahul, a committee not implicated by the

indictment.  *Id*. at 518; *supra* Part I.F., n.15.  Accordingly, petitioners' arguments are not

only procedurally barred, but are entirely without merit.

## V.    PETITIONERS' ARGUMENT THAT THE FIFTH CIRCUIT APPLIED AN INCORRECT HARMLESS ERROR ANALYSIS IS PROCEDURALY BARRED AND IN ANY EVENT MERITLESS

Petitioners contend (Pet. Mem. at 54-55) that the court of appeals violated their

due process rights by improperly applying the harmless error standard to conclude that

admission of certain evidence was harmless.  That contention is nothing more than an

attempt to re-litigate petitioners' claim that admission of the relevant evidence was reversible error – a claim raised and disposed of on direct appeal – by characterizing the court of appeals' rejection of that claim as a due process violation. It is well established that a federal habeas petitioner may not re-litigate claims already decided on direct review by repackaging them under a different legal theory. *See, e.g.*, *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000) (refusing to "reconsider claims of error that were raised and disposed of on direct appeal," where petitioner had "merely re-characterized his prior immunity claim as a due process claim"). The principle that a petitioner under § 2255 may not re-litigate claims already disposed of on direct review would be meaningless if a petitioner could obtain reconsideration of his claims simply by characterizing the adverse outcome on direct review as a due process violation. By explicitly incorporating their petition for rehearing en banc as the sole source of argument and authorities in support of this claim, petitioners effectively concede that they are asking this Court to overrule the court of appeals. It should go without saying that this Court should not grant that request.

In any event, petitioners' claim is wrong on the merits. The court of appeals' harmless error conclusion was a sound application of the Supreme Court's and Fifth Circuit's precedents on harmlessness. *See* 664 F.3d at 526 (quoting and applying the proper standard). The court of appeals expressly noted that it considered harmlessness in light of the entire trial proceedings and that it conducted a record-intensive examination. *Id.*; *see also id.* at 535 ("Rather than be left with a grave doubt about the verdict, we conclude that the weight and cumulative nature of the other evidence at trial precludes a finding that the errors complained of had a substantial influence on the jury."). Nor did

the court of appeals err in failing to account for a prior mistrial, which was irrelevant to

the harmlessness of the evidentiary errors before the jury that decided the case.  Thus, the

court of appeals' thorough and thoughtful 170-page opinion, properly addressing not only

harmless error but every claim of error that was raised, plainly afforded meaningful

review to petitioners.

## VI.   PETITIONERS ARE PROCEDURALLY BARRED FROM RAISING SELECTIVE PROSECUTION, WHICH IN ANY EVENT HAS NO MERIT

Petitioners again argue (Pet. Mem. at 59-60) that this prosecution was brought for

improper purposes.  To the extent they argue that trial counsel were ineffective for not

raising a selective prosecution defense, the government has already demonstrated that

such a defense would have been meritless and that it was therefore reasonable for trial

counsel not to raise it.  *See supra* at I.E.2.  To the extent that petitioners pursue this claim

for the first time on collateral review, it is procedurally barred by virtue of not having

raised it earlier.  Petitioners have neither attempted to show cause for their default, nor

any prejudice.  *Shaid*, 937 F.2d at 232.  Accordingly, this argument entirely lacks merit.

## VII.   ODEH PRESENTS NO EVIDENCE THAT HIS COUNSEL GAVE HIM INCORRECT ADVICE REGARDING A POTENTIAL PLEA PRIOR TO THE SECOND TRIAL

Odeh alleges that his trial counsel misled him by advising him that the fact of his

guilty plea could be used against his co-defendants.  *See* Odeh Mem. at  4-5 and Affidavit

of Abdulrahman Odeh, Nov. 18, 2013 ("Odeh Aff.").  When a defendant alleges that

counsel's deficient performance caused him to reject a plea offer, he must show that,

> but for the ineffective advice of counsel there is a reasonable probability that the
> plea offer would have been presented to the court (*i.e.* that the defendant would
> have accepted the plea and the prosecution would not have withdrawn it in light
> of intervening circumstances), that the court would have accepted its terms, and

that the conviction or sentence, or both, under the offers' terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, —— U.S. ——, 132 S.Ct. 1376 (2012); *United States v. Reed*, 719 F.3d 369 (5th Cir. 2013).

Here, Odeh argues that his counsel gave him incorrect information about a favorable plea offer, and that but for the incorrect information from his counsel, he would have accepted the plea. The evidence, however, establishes to the contrary. According to emails exchanged between the prosecution and Odeh's trial counsel, Odeh was prepared to plead guilty to perjury if the government guaranteed no jail time. The government declined to accept that condition. Odeh presents no evidence that with respect to that proposed plea agreement, discussed just prior to the second trial, he was affected by any alleged misinformation provided by his counsel. *See* Appendix at 22-24 (reflecting email conversation between James T. Jacks and Gregory Westfall).

Odeh's declaration does not assist him in this regard. Odeh's declaration describes an alleged plea offer where "he would plead to a charge of structuring bank deposits." Odeh Aff., ¶ 2. Odeh does not identify when this alleged plea offer occurred. Moreover, Odeh's declaration fails to allege that he received incorrect advice regarding plea discussions that occurred just prior to the second trial. Just prior to the second trial, government counsel offered Odeh an opportunity to plead to one count of perjury for lying in the grand jury. The plea would have resulted in an "[a]djusted offense level 12 (zone C). Criminal history category 1 . . . equals a guideline range of 10-16 months." Appendix at 22. Odeh's counsel, Mr. Westfall, responded that he would accept the plea if the government agreed to "[p]lead to information one count of perjury 11(c)(1)(C) to 6

months home confinement. " Appendix at 24.

The government would not agree to those conditions. Appendix at 24. The second trial began with jury selection on September 4, 2008, approximately three weeks after plea discussions between the government and Mr. Westfall ended. The exchange between Mr. Westfall and Mr. Jacks is significant in several respects. First, it demonstrates that Odeh was willing to accept a plea if his demand of no jail time was met. Second, Odeh never alleges in his declaration that his lawyer gave him incorrect advice with respect to a perjury plea, or that any incorrect advice led him to reject that plea. To the contrary, based on his counsel's counteroffer, what led Odeh to reject the plea was the government's refusal to accept his demand for no jail time. Finally, the exchange indicates that any alleged discussions involving Odeh's plea to a structuring charge occurred prior to the discussion of a perjury plea. Not only does the timing of the perjury discussion -- just prior to the second trial -- make that evident, but also the fact that Mr. Jacks referred in his email to earlier discussions. In rejecting Mr. Westfall's condition of home confinement, Mr. Jacks responded, "Greg, That's the same thing we turned down last time." Appendix at 24.

Odeh cannot, therefore, establish that he was prejudiced by anything that his lawyer told him with respect to alleged discussions about structuring that occurred prior to the perjury offer that Odeh rejected. Nowhere does Odeh state that he was misled with respect to the perjury offer; rather, the evidence suggests that he rejected it because 8-14 months confinement was unacceptable to him. Odeh was entitled to make that decision and take his chances at trial. *Stano v. Dugger*, 921 F.2d 1125, 1147 (11th Cir. 1991) ("The defendant remains the master of his case, particularly with respect to the entry of a

guilty plea.").  Having made that choice, however, he cannot prevail post-conviction on a claim of ineffective assistance of counsel.

## VIII.   TRIAL COUNSEL EFFECTIVELY REPRESENTED ODEH WHEN HE PARTICIPATED IN CROSS-EXAMINING WITNESSES

Odeh argues that his trial counsel was ineffective because he cross-examined witnesses that did not testify specifically about him.  Odeh Mem. at 5.  This argument is frivolous for numerous reasons.  First, Odeh was indicted for conspiracy with HLF, and was the head of HLF's New Jersey office.  It was therefore reasonable for his counsel to attempt to defend against the government's entire theory of the case as it applied to HLF and its co-conspirators.  Second, it was reasonable to maintain a joint defense, given the defense strategy of claiming that defendants were engaged in mere charity and had not knowingly provided financial support to Hamas. It also divided the work load among counsel so that each could maximize the impact of his or her cross-examination.  Third, Odeh argues that by participating in the cross-examination of witnesses, the jury was left with the impression that his role was greater than he says it was.  But Odeh's trial counsel spent the majority of his summation arguing to the jury that Odeh's role was minimal. Trial counsel reviewed the government's evidence against Odeh and repeatedly contrasted it to the quantum of evidence against the other defendants.  R. 7/9586-99. Despite those arguments and attempts to distance himself from the other defendants, the jury still convicted Odeh.  In short, the decisions of how to divide up the cross-examination of the government's witnesses and whether Odeh's lawyer would participate in the questioning are quintessential matters of strategy for which Odeh has demonstrated

no prejudice.  Such tactical decisions cannot support a claim of ineffective assistance of

counsel.

**IX.   APPELLATE COUNSEL EFFECTIVELY REPRESENTED ODEH ON APPEAL WITH REGARD TO HIS SENTENCE AND THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT CONSPIRACY**

**A.  It Was Reasonable Not to Appeal Odeh's Sentence Under *Booker***

Odeh contends that appellate counsel was unconstitutionally ineffective by failing

to raise as an appellate issue whether Odeh's fifteen year sentence was reasonable.  This

argument fails for two reasons.  First, appellate counsel did in fact attack the sentences

imposed on all petitioners by challenging the application of the terrorism enhancement.

This was a highly reasonable decision, because the terrorism enhancement provides for

an offense level enhancement and an automatic increase to criminal history category VI.

2002 Sentencing Guidelines, Section 3A1.4.  As a result, each of the defendants received

a 12-level sentencing enhancement.  If appellate counsel had succeeded in reversing the

application of that 12-level enhancement, the petitioners' sentences would have been

significantly lower.  Appellate counsel were entitled to make the strategic decision that

they were more likely to succeed in reversing the terrorism enhancement than they were

to convince the Fifth Circuit that Odeh's sentence was unreasonable and an abuse of

discretion under *Booker*.  *See United States v. Ogbemudia,* 364 Fed.Appx. 72, 74 (5th Cir.

2010) (post-*Booker*, a sentence is reviewed for reasonableness under an abuse-of-

discretion standard).

Second, Odeh's sentence was neither unreasonable nor out of proportion with the

sentences of his co-defendants.  Odeh claims that he received "the maximum sentence

even though he had no criminal record and was, acknowledged by the government and

trial court, the least culpable of all of the defendants." Odeh Mem. at 6.   But Odeh did

not receive the maximum possible sentence.  His sentence was comparatively the lowest

compared to the other defendants charged with the same crimes, and his lack of criminal

history is irrelevant, because with the terrorism enhancement, his criminal history went

up to a Level VI.

        Odeh and Abdulqader were both tried on three counts of conspiracy.  Both were

convicted on Count 1 (conspiracy to provide material support to a Foreign Terrorist

Organization), Count 11 (conspiracy to provide funds, goods, and services to a Specially

Designated Terrorist), and Count 22 (Conspiracy to Commit Money Laundering).   The

maximum sentence for Count 1 was 15 years' imprisonment, the maximum sentence for

Count 11 was 10 years' imprisonment, and the maximum sentence for Count 22 was 20

years.  Odeh was sentenced to a total term of imprisonment of 15 years.  By contrast,

Abdulqader was sentenced to 20 years' imprisonment -- five years more for the same

convictions.  Although petitioner complains that he received the maximum sentence for

Count 1, he neglects to recognize that he was convicted on three counts, not one.  Given

the application of the terrorism enhancement, Odeh's sentence was reasonable and

proportional, and in light of the highly deferential standard of review, appellate counsel

reasonably elected not to argue otherwise.

### B.  Appellate Counsel Reasonably Elected Not to Argue Sufficiency of the Evidence

        As noted above, the standard of review on appeal for claims of insufficiency of

evidence is highly deferential to the jury's verdict.  *Johnson v. Louisiana,* 369 F.3d 826,

830 (5th Cir. 2004) and *supra* Part II.  Given the voluminous evidence supporting

conviction, it was reasonable for appellate counsel not to challenge the sufficiency of the evidence with regard to Odeh.

As an initial matter, the evidence against HLF clearly established the conspiracy, *see supra* at 3-12, and Odeh was part of HLF. *See also El-Mezain*, 664 F.3d at 527-534. Odeh joined the conspiracy in 1994, when he became the head of the HLF's New Jersey office. As head of HLF's principal East Coast office, Odeh was an integral part of HLF's fundraising activities and knowingly participated in HLF's conspiracy to support Hamas. Odeh's New Jersey office was particularly effective in gathering orphan sponsorships and contributions for HLF. In a two month period in 1996, the New Jersey office raised over $62,000, nearly double that of other HLF branch offices. GX HLF Search 3. During that period, the New Jersey office garnered 19 orphan sponsorships, compared to one for Michigan, seven for Houston, and nine for Chicago. *Id.* Odeh regularly spoke to HLF headquarters in Dallas about martyr sponsorships, including requests to support martyrs from specific locations in the West Bank. *Id.*

In addition, the evidence showed that an individual named Sultan Mahmoud, on November 29, 1996, sent a contribution to HLF's New Jersey office. The accompanying letter stated that the money was for "relief supplies and weapons to crush the hated enemy."[21] GX HLF Search 25. Defendant Odeh accepted this contribution on behalf of HLF, which added Mr. Mahmoud to its mailing list. Mr. Mahmoud's letter, moreover, was found in Odeh's office five years after it was received. GX HLF Search 25; GX

---

[21] This rhetoric is consistent with other correspondence sent to the HLF, demonstrating the perception in the Muslim community that HLF was the vehicle by which to support the mujahadeen and
the jihad in Palestine. *See, e.g.*, GX Infocom Search 7, 8, 9 and 10.

HLF Search 94; *El-Mezain*, 664 F.3d at 530 (noting that HLF not only kept Mahmoud's contribution but continued to solicit and receive funds from him through 1998).

Odeh's support for Hamas was also apparent.  In a telephone conversation with El-Mezain on January 22, 1995, moments after Hamas had executed a suicide bombing, Odeh excitedly told him to listen to Radio London, as there had just been "a beautiful operation."  Odeh went on to explain that the operation was carried out by Hamas Movement activists in Beit Lod, and that this "beautiful operation" (two consecutive explosions) resulted in 18 dead and 60 injured.  GX  El-Mezain Wiretap 4; *El-Mezain*, 664 F.3d at 530 (citing 1996 phone call as evidence of Odeh's state of mind). The same day, a report of the bombing from the Islamic Association for Palestine ("IAP") Information Office was faxed to El-Mezain. That report detailed the bombing, explaining that a booby trapped car had exploded, with a second explosion doubling the injuries. The IAP bulletin surmised that the Yehya Ayyash, the Hamas "Engineer," was responsible for building the explosives used in the bombing.  GX El-Mezain Wiretap 1.  Odeh was very familiar with Yehya Ayyash.  Soon after Ayyash was killed in January 1996, Odeh began to sponsor Ayyash's children.  GX HLF Search 179; GX Infocom Search 99; *El-Mezain*, 664 F.3d at 530.

In addition, a publication entitled "The Palestinian Intifada in the Hebrew Press - A study about The Islamic Resistance Movement 'Hamas'" was seized from the HLF's New Jersey office.  GX HLF Search 109.  That publication, published by the United Association for Studies and Research ("USAR"), part of the Palestine Committee, discussed the arrests of numerous high-ranking Hamas leaders, including Sheik Mohamed Fouad Abou Zeid, Sheik Bassam Jarar, Sheik Jamil Hamami, and Ghassan

Hermas, among others. These leaders are the same as those in charge of zakat committees named in the indictment and to which the HLF gave millions of dollars, and the same as those identified as "ours" in the records of the Palestine Committee.[22] *See* GX Elbarasse Search 22. Contrary to Odeh's arguments, therefore, a reasonable juror could easily conclude that Odeh was well aware that the Indictment Committees for which he and HLF raised money were part of the Hamas social infrastructure.

Further, another book seized from Odeh's New Jersey office, entitled *The Jihadist School*, was published by the IAP, also a Palestine Committee component. As the Fifth Circuit pointed out, that book chronicled the life of the martyr Izz El-Din al-Qassam, the namesake of Hamas' military wing. "A list of 'important addresses' printed by the publisher in the back of the book included HLF's previous address in Indiana." *El-Mezain*, 664 F.3d at 531. Also found in Odeh's office was a flyer announcing the one-year anniversary of Sheik Yassin's imprisonment, GX HLF Search 31, and a photograph of Hamas Leader Khalid Mishal with Hezbollah leader Hassan Nasrallah and cleric Yousef al-Qaradawi, GX HLF Search 30.

In sum, as the HLF's representative on the East Coast, a reasonable juror could find that Odeh was an integral part of HLF's fundraising activities and knowingly participated in HLF's conspiracy to support Hamas. Accordingly, appellate counsel's decision to focus on numerous other claims, rather than to challenge the sufficiency of the evidence, was neither deficient nor prejudicial.

---

[22] Abu Zaid was on the Jenin Zakat Committee; Hamami ran the Islamic Science and Culture Committee, and Hermes was the dominant figure on the Bethlehem Zakat committee, later moving to the Bethlehem Orphan Care society (along with HLF's contributions). GX Elbarasse Search 22.

### X.    AN EVIDENTIARY HEARING IS UNNECESSARY

"A motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *United States v. Bartholomew,* 974 F.2d 39, 41 (5th Cir. 1992).  However, when, as here, a movant for relief under 28 U.S.C. § 2255 has presented claims that are either contrary to law or plainly refuted by the record, an evidentiary hearing is not necessary.  *Bartholomew,* 974 F.2d at 41 (holding there was no abuse of discretion in denying a Section 2255 motion without a hearing where the movant's assertions of ineffective assistance were refuted by reference to the record itself); *United States v. Plewniak,* 947 F.2d 1284, 1290 (5th Cir.1991) (holding that an evidentiary hearing is not necessary when the file and records conclusively show the prisoner entitled to no relief).

There is no claim that the petitioners urge that is not either procedurally barred or conclusively rebutted based on the record evidence.  Accordingly, the Court should deny the petition in its entirety, without an evidentiary hearing.

## <u>CONCLUSION</u>

For all the reasons stated above, Petitioner Odeh's Motion for Relief under 28

U.S.C. § 2255 should be denied.

Dated:   January 31, 2014                  Respectfully submitted,


                                           SARAH R. SALDAÑA
                                           United States Attorney
                                           Northern District of Texas


                                 By:       */s/ Elizabeth J. Shapiro*
                                           ELIZABETH J. SHAPIRO
                                           D.C. Bar #418925
                                           JOSEPH F. PALMER
                                           United States Department of Justice
                                           P.O. Box 883
                                           Washington, D.C.  20044
                                           Tel: (202) 514-5302
                                           Email: elizabeth.shapiro@usdoj.gov